The **CAPITOL LIFE INSURANCE COMPANY and Wisconsin National Life Insurance Company**

v.

**Jack ROSEN, Individually and trading as Philadelphia Mortgage Insurance Consultants, et al.**

**Civ. A. No. 74-563.**

United States District Court,
E. D. Pennsylvania.

Oct. 30, 1975.

Reeder R. Fox, Philadelphia, Pa., for plaintiff.

Joseph R. Danella, Philadelphia, Pa., for defendant, Rosen.

Leonard Zack, Philadelphia, Pa., for defendant Lubers.

## OPINION AND ORDER

FOGEL, District Judge.

We have before us exceptions filed by defendants Jack Rosen and Philadelphia Mortgage and Insurance Consultants (Philadelphia Mortgage), to our rulings on motions, findings of fact, and conclusions of law announced orally in court at a hearing in this case on April 1, 1975. For the reasons expressed more fully in this opinion, we deny the exceptions and readopt our prior rulings on motions, findings of fact and conclusions of law.[1]

The original complaint was filed by The Capitol Life Insurance Company (Capitol Life) against Rosen, individually and trading as Philadelphia Mortgage, on March 8, 1974. The complaint alleged that Rosen had perpetrated a fraud on Capitol Life through a scheme by which Rosen obtained commissions on life insurance policies which Capitol Life was led to believe it had issued, but which had not in fact been delivered to the named individual insureds, because of the fraudulent actions of Rosen. On the day that the complaint was filed, a temporary restraining order was issued, to restrain Rosen and Philadelphia Mortgage from removing the contents of any bank accounts.

On March 15, 1974, an appearance was entered by counsel for Jack Rosen, who filed a motion to dismiss, based upon plaintiff's alleged failure to properly serve the defendant in accordance with Rule 4(d)(1) of the Federal Rules of Civil Procedure. That motion was denied without prejudice, after briefing and argument, on April 30, 1974.

On June 7, 1974, plaintiff sought leave to file an Amended Complaint so that Wisconsin National Life Insurance Company (Wisconsin National Life) could intervene as a party plaintiff and Alan Luber and Martin Luber could be joined as additional defendants. It was alleged that they had been participants in the scheme to defraud, and that the scheme had defrauded both plaintiff and intervenor plaintiff. Leave was granted for the amendment and the intervention. Defendant Rosen then filed another set of motions, again seeking to dismiss the complaints for failure to comply with Rule 4(d)(1), or, in the alternative, to obtain a specific statement of the alleged fraud. Both of these motions were denied on August 13, 1974, and defendant was granted leave to seek additional time for discovery. The additional time was granted on September 17, 1974. The Lubers entered an appearance on October 9, 1974, demanded a jury trial, and filed answers to the amended complaint and intervenor complaint on October 15, 1974. Rosen's answers to the amended and intervenor complaints had been filed on October 10, 1974.

On November 5, 1974, the third notice of deposition was filed by plaintiffs against defendant Rosen. Rosen's counsel sought a protective order on November 18, 1974. This was denied on November 19, 1974. Thereafter, on December 23, 1974, plaintiff and intervenor plaintiff moved for sanctions against defendant Rosen under Rule 37(d), for failure to appear for depositions and for failure to answer interrogatories. A consent decree settling the action as to the Lubers was entered on January 6, 1975. On the same day, sanctions were imposed on Jack Rosen for failure to appear for depositions and for failure to answer interrogatories. The sanctions consisted of foreclosing Rosen from presenting any defenses that ran to the

---

1. Our findings of fact and conclusions of law are set out in the appendix to this Opinion.

merits of the liability question. A hearing was then set for an assessment of damages, pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure.

At the hearing on February 26, 1975, counsel for Mr. Rosen sought leave to withdraw. The explanation offered was that counsel had not had any communication with their client, Jack Rosen, since sometime approximately two months prior to the filing of the original complaint, and so proceeding with a trial might leave them in the untenable position of taking unauthorized action. The withdrawal was allowed when new counsel was retained, either by or on behalf of Mr. Rosen.[2] The new attorneys made several objections to the evidence on damages as presented at the hearing. They also sought leave, which was granted, to file exceptions in the manner of a 12(b)(6) motion to dismiss for failure of the complaint to plead fraud with sufficient specificity to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. All of the motions and objections were ruled on at the hearing of April 1, 1975, prior to the oral delivery of the findings of fact and the conclusions of law. Judgment was entered against Mr. Rosen in favor of Capitol Life for $512,198.09, and in favor of Wisconsin National Life for $115,071.83. The exceptions which we have before us now relate to the rulings on the motions, including the motion which raises the question of the validity of the service of the complaint on Rosen, and the sufficiency of the evidence to support our findings of fact and conclusions of law. We will discuss these matters *seriatim.*

## I. PERSONAL SERVICE OF PROCESS

Rule 4(d)(1) of the Federal Rules of Civil Procedure authorizes personal service of the summons and complaint:

[u]pon an individual other than an infant or an incompetent person, by delivering a copy of the summons and of the complaint to him personally *or by leaving copies thereof at his dwelling house or usual place of abode* with some person of suitable age and discretion then residing therein or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.

(Emphasis added). Defendant Rosen contends that this Court lacks jurisdiction over his person because the complaint and summons were *not* left at his usual place of residence.

Service of the several complaints and amended complaints was made at 2539 Woodleigh Road, Havertown, Pennsylvania, as evidenced by the Marshal's returns. There is no question about the fact that Barbara Rosen, defendant's sister-in-law, and Irving Rosen, defendant's brother, reside at that address. It is also undisputed that they received the complaints and summons from the United States Marshal at that address. The core of the dispute is whether 2539 Woodleigh Road was, at the time of service, Jack Rosen's "dwelling house or usual place of abode." Rule 4(d)(1) of the Federal Rules of Civil Procedure.

Irving Rosen was deposed by the plaintiffs on March 18, 1974. He testified that his brother lived with him, at his residence, that there was a regular room that Jack used, that he paid rent and helped share expenses when he was there; that Jack Rosen kept his clothing and any other belongings at the house, that he had lived there with Irving Rosen and his family since August, 1971, and that, to the best of Irving's knowledge, Jack Rosen had no other regular place of abode. (Deposition of Irving Rosen at 7–8). Irving Rosen also testified that his brother would frequently be on journeys of varying duration, but that he would always return to the house. Also, defendant was regularly

---

2. The actual whereabouts of Jack Rosen were shrouded in mystery during this litigation.

paying fifty dollars a week for board to his brother and sister-in-law during 1973 and 1974, even when he was away from the house. *Id.* at 11–13. The last time that Irving Rosen had seen his brother before the date of his deposition was in early March, 1974, at which time defendant had said that he was going on another trip, but would be back. *Id.* at 22. Irving further added that there was nothing unusual or exceptional about his brother's leavetaking on that occasion. *Id.* at 16.

One of the documents which was filed in the case as an exhibit to the original complaint was a fictitious name declaration, filed with the Prothonotary of Philadelphia County, for the name "Philadelphia Mortgage and Insurance Consultants." Jack Rosen, who had filed the declaration in order to do business under that title in Philadelphia, had given his residence on the document as 2539 Woodleigh Road, Havertown, Pennsylvania.

■ Whether a particular location is a person's dwelling house or usual place of abode is to be determined from the facts in each particular case. *Karlsson v. Rabinowitz*, 318 F.2d 666, 668 (4th Cir. 1963); 2 J. Moore, Federal Practice ¶ 4.11[2] at 1039 (2d ed. 1974). If the objective facts, including statements of the individual, his practice of keeping clothing at a house, his practice of returning there from trips, his payment of rent and the availability of a room at all times, point to a certain place as being the dwelling house or usual place of abode, then the rule should be liberally construed so as to effectuate service at that location. *Rovinski v. Rowe*, 131 F.2d 687, 688–89 (6th

Cir. 1942); 2 J. Moore, *supra*, at 1042. Since there has not been any showing by defendant that he is in fact resident somewhere other than the Woodleigh Road address, we feel it is quite appropriate to hold that that house constitutes his dwelling place or usual place of abode for the purposes of service under Rule 4(d)(1).[3] The exception accordingly will be denied.

## II. THE SUFFICIENCY OF FRAUD COUNTS IN THE PLEADINGS AND THE SUFFICIENCY OF THE EVIDENCE THEREOF

■ Defendant has reasserted his earlier claim that fraud was not pleaded with sufficient particularity to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. He also excepts to our Findings of Fact 15 and 26 on the ground that there was insufficient evidence to support a finding that Jack Rosen was engaged in a scheme to defraud Capitol Life and Wisconsin National Life. The latter exception is inappropriate at this stage of the action, since it relates to liability, an area which was foreclosed by the sanctions imposed upon the defendant for his failure to submit to depositions or answer interrogatories. The former exception has been ruled upon, and we hereby reaffirm and readopt our prior ruling. Rule 37(b) and (d) of the Federal Rules of Civil Procedure.

■ The objection to the pleadings for failure to state the circumstances of fraud with sufficient particularity, as required by Rule 9(b) [4] would ordinarily be raised as a motion to dismiss under Rule 12(b)(6). We gave counsel for Mr. Rosen a special opportunity to raise that objection at the hearing on dam-

---

3. On several occasions, counsel for Jack Rosen has asserted that the defendant does not reside at 2539 Woodleigh Road. It has also been asserted that Mr. Rosen never received or had notice of the complaint and summons. The cited authorities make it clear that compliance with the rule is sufficient to give personal jurisdiction, regardless of such unsubstantiated assertions of counsel.

4. Rule 9(b) reads as follows:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

ages, because the attorney had not been involved in the case until that time, and because the issue went to the heart of the sanction barring any defense on the merits as to liability. If the complaint had in fact failed to state a claim upon which relief could be granted, we would not want to impose liability on the defendant, regardless of the egregiousness of his failure to submit to discovery. Furthermore, the objection did not require any examination into the merits of the action, and so was not inconsistent with the sanctions which we had imposed.

The standard governing the application of all Federal Rules of Civil Procedure is given in Rule 1:

> [These rules] shall be construed to secure the just, speedy, and inexpensive determination of every action.

We shall examine the allegations of fraud in the respective complaints of Capitol Life and Wisconsin National Life within this context.

The amended complaint of Capitol Life includes the following bases for the relief demanded:

> The actions of Martin Luber, Alan Luber and Rosen fraudulently induced Capitol Life to believe that the policies which it had issued were in force and that Martin Luber and Alan Luber were therefore entitled to advance and earned commissions.

Amended Complaint of Capitol Life, ¶ 19.

> [C]ertain portions of the commissions received by Martin Luber and Alan Luber had been paid over to Rosen, . . . Rosen was engaged in a scheme to defraud Capitol Life, and . . . Rosen had induced Alan Luber and Martin Luber not to deliver the policies to the individual named insureds.

Amended Complaint of Capitol Life, ¶ 16 (in pertinent part). Essentially identical claims were made by Wisconsin National Life.

Defendant Rosen argues that these are insufficient to comply with the requirements of Rule 9(b). He argues that the federal rules require that the Pennsylvania rules for pleading be satisfied. This argument, we believe, confuses the sufficiency of the pleading with the burden of proof to be met at trial. The Pennsylvania rules would indeed govern the quantum of substantive evidence which must be developed at a trial to establish fraud. However, the federal rules govern pleading requirements. *See Consumers Time Credit, Inc. v. Remark Corp.*, 227 F.Supp. 263 (E.D.Pa.1964).

A recent case in this District gave the following statement of the Pennsylvania law on the elements of fraud:

> "[A] misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or refrain from acting in reliance thereon in a business transaction" constitutes actionable fraud.

*Seligson v. Plum Tree, Inc.*, 361 F.Supp. 748, 756 (E.D.Pa.1973). The complaint was held to state a claim for fraud, but it failed to do so with sufficient particularity to satisfy Rule 9(b), because the complaint stated the content of the alleged misrepresentations, the facts allegedly misrepresented, and what was given up as a result of the fraud, but did not specify the time, place or circumstances of the misrepresentations.

> General allegations [of fraud] are insufficient and enough facts must be set out to apprise the adversary as to what acts are relied upon as constituting fraud or mistake.

*New York, N. H. & H. R. R. v. New England Forwarding Company*, 119 F. Supp. 380, 382 (D.R.I.1953).

> Moreover, it should be pointed out that the requirement of Rule 9(b) that fraud be pleaded with particularity does not mean that a textbook pleading of all of the elements of fraud are [sic] required but requires

that the complaint set forth the facts with sufficient particularity to apprise the defendant fairly of the charges made against him. It must be remembered that the Court at this time is not deciding whether or not the plaintiff has sufficiently proved its case . . . . That question will arise at trial. The Court is now merely determining the sufficiency of a pleading.

*Union Mutual Life Insur. Co. v. Simon,* 22 F.R.D. 186, 187 (E.D.Pa.1958).

 We believe that the federal rules require that sufficient facts be pleaded in the complaint to show that the allegations of fraud are more than mere puffing or filler. When, as here, the fraud is alleged to encompass a scheme involving several persons and taking place over many months, with many essentially identical transactions, it is not, however, necessary to detail more than that recited by plaintiffs in their complaint:

1) identification of the participants;

2) that some of the participants obtained what purported to be applications for life insurance;

3) that policies were issued and advance and earned commissions were paid to some of the participants and were split among all of them;

4) the commissions were paid in the belief that there were policies of life insurance in effect with insured individuals to pay the premiums, when in fact these policies were not in effect;

5) that the participants in the scheme, or at least some of them, knew that this was the case, and that the insurance company would rely on the issuance of a policy to mean that a policy was in effect, and would part with money for commissions on the basis of that belief.

When coupled with the dates which encompassed the period of the scheme and the location of the participants and their business outlets, this is certainly specific enough. The defendants were fairly apprised of what Capital Life and Wisconsin National Life believed to be the factual basis for the complaint. The period allotted for discovery, which was not so utilized by defendant Rosen, would have given him the opportunity to obtain specific details and information with respect to the alleged scheme. It might also have been developed at that time whether there was a conspiratorial scheme or an individual scheme, or no scheme at all. The evidence obtained at the hearing on damages as to the participation or non-participation of the Luber brothers in the scheme with Jack Rosen is completely irrelevant for the purposes of this exception, since from the face of the pleadings it could well have been developed that there were in fact links between the defendants. Rule 12(b)(6) of the Federal Rules of Civil Procedure.

In view of the foregoing, we therefore deny the exceptions on the fraud aspect and readopt our prior ruling.

### III. SUFFICIENCY AND QUALITY OF EVIDENCE ON DAMAGES

Defendant Rosen excepts both to the sufficiency of evidence on damages and to the quality of the evidence developed on damages. The latter point relates primarily to the acceptance by this Court of survey evidence, which, it is claimed, rests on inadmissible hearsay. We hereby reaffirm and readopt our ruling, made earlier at the April 1, 1975, hearing, that the damages awarded have been proved sufficiently to meet the requirements of Pennsylvania law, and that the survey evidence, for the limited purpose of adding to the evidence tending to show that the policies were never in effect or delivered to the individual named insureds, is admissible.

It was alleged that part of the fraud involved inducing the insurance companies to believe that there were outstanding policies of insurance, and that these policies had in fact been delivered to the

individual named insureds, thereby creating an apparent resource which merited the payment of advance and earned commissions to the Lubers. While the sanctions imposed for failure to submit to discovery essentially foreclosed any question of whether the actual scheme was in fact as just described, we decided to hear evidence at the hearing on damages on the question of whether the policies had in fact been delivered, with the individual insureds simply not paying the premiums, or whether the policies had never been delivered, because the individuals named as insureds never had been covered and actually had never contracted for the insurance. A significant element of this evidence consisted of the results of surveys conducted by and on behalf of the two insurance companies when they became aware that premiums were not being submitted on many of their policies. These surveys are the subjects of the exceptions filed by Mr. Rosen's counsel.

There are two potential levels of hearsay in a survey. The first level relates to the people who actually made the survey, if they are not in the courtroom to testify. The second level involves the subjects who were examined in order to develop the data base for the survey. In this case the individuals who directed or made the surveys were present and testified at the hearing. They spoke from personal knowledge of, and were subject to cross-examination about their methods and results. Their interpretation of those results—that no policies of insurance were ever delivered to the individual named insureds by Jack Rosen or the Lubers—was also subject to cross-examination with respect to errors in methodology. None were developed and the evidence given by the plaintiffs on this score was not shaken.

■ The second level of hearsay is much more difficult, however. None of the approximately four thousand individual named insureds were in the courtroom to testify. Yet the surveys were utilized for the purpose of establishing as fact what these individuals allegedly would have said had they been called— that none of them ever received a policy of insurance from the Lubers or from Jack Rosen. We heard testimony with respect to the sampling techniques used, and we were shown the questionnaires which were sent out. The answers called for were simple and direct, involving primarily the checking off of "yes" or "no" for any single question. Those questions were ones which could be readily understood by the people who were called upon to answer them. There was a significant check on whether the respondent was one of the individual named insureds, since the questionnaires were mailed to the named individuals and the respondents were to provide their names and addresses and to sign the letter before returning it. Also, and significantly, there was no incentive to lie. No one was being asked to pay any money. In fact, to the contrary, there was an incentive to respond if the individual had paid for and received the policy, since such a person would probably desire to maintain the insurance in force. The situation is similar to that discussed in *Zippo Mfg. Co. v. Rogers Import, Inc.*, 216 F.Supp. 670 (S.D.N.Y. 1963), which dealt at length with the applicable standards under which survey evidence may be admitted despite its hearsay roots. The parallel is particularly apt when no other procedure can provide the information needed. It would have been totally impractical to bring into court over four thousand people solely to answer the questions taken in the survey. Given the probability of trustworthiness and the complete absence of responses indicating the receipt of a policy, we admitted the surveys as cumulative evidence which tended to show that no policies of insurance were ever delivered to the individual named insureds by Jack Rosen or by the Luber

brothers. We reaffirm that decision, and therefore deny the exceptions directed to "inadmissible hearsay."

As this suit is in diversity, the law of Pennsylvania governs with respect to the standards for and burden of proof as to damages. *See* 5 J. Moore, Federal Practice ¶ 43.08 at n.7 and cases cited therein (2d ed. rev. 1974). The standard in a Pennsylvania civil case for determining damages is "on the preponderance of the evidence". *Vlases v. Montgomery Ward & Co.*, 377 F.2d 846, 851 (3d Cir. 1967) (citing Pennsylvania cases). *See also Blackburn v. Aetna Freight Lines, Inc.*, 368 F.2d 345, 347–48 (3d Cir. 1966) (quoting Pennsylvania cases:)

> "The law does not require that proof in support of claims for damages or in support of claims for compensation must conform to the standard of mathematical exactness . . . . [Citation omitted.] Our law only requires that a reasonable quantity of information must be supplied by plaintiff so that the jury may fairly estimate the amount of damages from the evidence. [Citation omitted]."

The following information on damages was presented to us:

(1) for both Capitol Life and Wisconsin National Life, the dollar amount of commissions paid, collectors' fees paid, and premiums received;

(2) that no premiums were ever received from any of the individual named insureds on any of the policies;

(3) that all premiums received were either from the Luber brothers with the initial application for insurance, or from Jack Rosen or Philadelphia Mortgage thereafter;

(4) that no premiums were received from Jack Rosen or Philadelphia Mortgage after February, 1974;

(5) that Jack Rosen disappeared in or about February, 1974;

(6) that an investigation by each insurance company did not develop even a single positive response to questions of whether the individual named insureds had received policies written by those companies from Philadelphia Mortgage or had in fact been insured with policies from the respective insurance companies which believed that they had issued policies in the names of these individuals.

(7) that, for Capitol Life, two mail surveys were conducted; the first, of some three hundred people chosen at random from among the insureds who had been obtained through Jack Rosen and the Lubers, with the aid of Ernst & Ernst, the company's accountants; and the second, of *all* supposed policy-holders of Capitol Life obtained by that company through Rosen and the Lubers; and that not a single response to either survey established that a named individual insured had ever received a policy of insurance from Capitol Life through Jack Rosen, Philadelphia Mortgage, or the Luber brothers;

(8) that, for Wisconsin National Life, a mail survey was conducted by the company of all persons who supposedly were individual named insureds obtained through Jack Rosen and the Lubers, and that no respondent had ever received a policy of life insurance from Wisconsin National Life through Jack Rosen, Philadelphia Mortgage, or the Luber brothers;

(1) that a phone survey made by the Lubers of fifty to sixty persons selected from the people obtained through Jack Rosen, had produced identical results.

On the basis of the above-recited information, we concluded that the damage award should be calculated as follows: commission payments to the Lubers, plus collectors' payments to Jack Rosen and Philadelphia Mortgage, less ostensible premiums received from the Lubers and Jack Rosen. In arriving at the figure for Capitol Life, there was a subsidiary question of how to treat the contractual provision which provides for crediting only approximately ninety per-

cent of the premiums received to the account of the agent. Capitol Life had initially sought a damage award which was greater than the damages it had suffered by our calculations. Upon questioning, counsel for plaintiffs agreed that the claim should be treated as one for fraud, and not as one for breach of contract; in the latter case the contractual provisions governing crediting of premiums might have been considered operable. The award to Capitol Life was therefore smaller than the sum sought in their proposed Findings of Fact and Conclusions of Law.

## IV. DEFENDANT ROSEN'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

 The final exception taken by defendant Rosen was to our failure to adopt his proposed findings of fact and conclusions of law. Those proposed findings and conclusions were mutually inconsistent with the results reached by the Court, and so they could not be adopted.

## V. CONCLUSION

For the reasons discussed more fully above, we will deny all of defendant Rosen's exceptions to our findings of fact and conclusions of law. Interest will be calculated from April 1, 1975, the date on which the verdict was entered.

An Order will be issued accordingly.

### APPENDIX[5]

*[Findings of Fact]*

(1) Plaintiff, Capitol Life Insurance Company, is a life insurance company incorporated under the laws of the State of Colorado and has its principal place of business at 1600 Sherman Street, Denver, Colorado. Capitol Life is duly qualified to transact life insurance business in the Commonwealth of Pennsylvania.

(2) Intervenor plaintiff, Wisconsin National Life Insurance Company, is a life insurance company incorporated under the laws of the State of Wisconsin and has its principal place of business in Oshkosh, Wisconsin.

(3) Defendant, Jack Rosen, is an individual who resides or has a usual place of abode at 2539 Woodleigh Road, Havertown, Pennsylvania.

(4) Defendant, Alan Luber, is an individual residing at 609 North Suffolk Avenue, Ventnor, New Jersey.

(5) Martin Luber is an individual residing at 213 North Essex Avenue, Margate, New Jersey.

(6) Jurisdiction herein is based upon diversity of citizenship. The amount in controversy is in excess of $10,000.00, exclusive of costs and interest.

(7) On March 19, 1973, Rosen filed an individual fictitious name registration for the name "Philadelphia Mortgage and Insurance Consultants," and thereafter operated a personal debt consolidation business under that name with an office and place of business at Room 301, 1920 Chestnut Street, Philadelphia, Pennsylvania.

(8) On or about February 26, 1973, Capitol Life entered into a Home Loan Protection Agreement with Rosen, individually and trading as Philadelphia Mortgage and Insurance Consultants, hereafter referred to as Philadelphia Mortgage.

(Notes of testimony 102.)

(9) On or about February 15, 1973, Capitol Life appointed the defendants, Martin Luber and Alan Luber, as general agents and entered into an Agency Representative Contract and Open Book Account Agreement with Martin Luber.

(Notes of testimony 18, 20 and 21.)

(10) Subsequent to the appointment of Martin and Alan Luber as General Agents for Capitol Life, Martin and Alan Luber procured applications for

---

5. Transcript of Hearing on April 1, 1975, at 17–28.

life insurance and forwarded such applications to Capitol Life. In the case of those insurance applications which were approved by Capitol Life, life insurance policies have been issued by Capitol Life and mailed to Martin and Alan Luber for delivery to the individual named insureds.

(11) During the period since February 15, 1973, Capitol Life has paid to Martin and Alan Luber total advance and earned commissions of $793,566.93. (Notes of testimony 98.)

(12) On or about February 26, 1973, Capitol Life entered into a Home Loan Protection Plan Agreement with Jack Rosen.

(13) During the period since February 25, 1973, premiums were remitted to Capitol Life from Jack Rosen, Alan Luber and Martin Luber in the total amount of $284,459.13 on insurance policies issued by Capitol Life.

. . . . . .

[O]f this amount, $181,674.00 was received directly from Jack Rosen and Philadelphia Mortgage Consultants. The entire amount remitted in premiums was for business generated through philadelphia [sic] Mortgage Consultants and Jack Rosen. (Notes of testimony 104.)

(14) Pursuant to the Home Loan Protection Agreement with Jack Rosen, Capitol Life has paid Jack Rosen total collection fees of $3,091.29. (Notes of testimony 105.)

(15) In February 1974 Capitol Life learned that its policies had never, in fact, been delivered by Martin and Alan Luber to the individual named insureds and that no such insurance was now in force. Further investigation by Capitol Life indicated that certain portions of the commissions received by Martin Luber and Alan Luber had been paid over to Rosen, that the policies had been turned over to Rosen, that Rosen was engaged in a scheme to defraud Capitol Life, and that Rosen had induced Alan Luber and Martin Luber not to deliver the policies for the individual named insureds, but to deliver the policies to Rosen.

(16) In February and March 1974 Ernst and Ernst, auditors for Capitol Life, in cooperation with Capitol Life and as part of a business audit carried out to determine why premiums were not being received from individual named insureds who had been procured through the Lubers and Jack Rosen, sent out 600 confirmation letters to a random sample of the insured individuals.

(17) The confirmation letter sent out by Capitol Life and Ernst and Ernst asked whether a policy of insurance had ever been received. Of the responses received, not one stated receipt of any policy of insurance issued by Capitol Life. (Notes of testimony 107 and 110.)

(18) On March 29, 1974, Capitol Life sent a letter to all persons whose applications for insurance had been obtained through the defendants and accepted by Capitol Life. This group consisted of 3,148 policyholders. . . . [T]he Capitol Life letter asked whether a policy of insurance had ever been received by such persons and all responses received by Capitol Life to these letters stated that no policies of insurance had been received.

(19) After February 1974 no further insurance premiums were ever received from any of the policies or on any of the insurance business which purportedly had been obtained through the Lubers and Jack Rosen.

(20) The difference between the payments to the Lubers and Jack Rosen and the receipts and premiums received from the Lubers and Jack Rosen by Capitol Life Insurance Company was $512,198.-09.

(21) On or about July 12, 1973, Wisconsin National executed an Appoint-

ment and Agreement of Broker-Agent with Martin Luber. On or about August 15, 1973, Wisconsin National executed an Appointment and Agreement of General Agent with Alan Luber. Subsequent to their appointment as General Agent and Broker-Agent, respectively, for Wisconsin National, Alan Luber and Martin Luber procured applications for life insurance and forwarded such applications to Wisconsin National. These applications were obtained by the Lubers from Jack Rosen.

(22) In the case of those insurance applications which were approved by Wisconsin National, life insurance policies were issued by Wisconsin National and were mailed for Alan Luber and Martin Luber for delivery to the individual named insureds.

(23) Pursuant to agreements with Martin and Alan Luber, Wisconsin National has paid total advance and earned commissions of $157,075.08 to the Lubers for the insurance business purportedly produced by them. Such payments to Alan and Martin Luber were made through Alan Luber as General Agent.

(24) Subsequent to the appointment of Alan Luber and Martin Luber as General Agent and Broker-Agent respectively for Wisconsin National, what purported to be gross premiums totalling $42,003.25 were received by Wisconsin National on insurance policies issued by Wisconsin National which represented insurance business generated by Jack Rosen and produced by Alan and Martin Luber. The first monthly premium was paid by the Lubers with the application and all subsequent monthly premiums were billed directly to Jack Rosen and Philadelphia Mortgage Consultants.

(25) In February 1974 Wisconsin National discovered that the insurance policies issued by Wisconsin National and sent to Martin and Alan Luber for delivery to the named individual insureds had

never, in fact, been delivered to the individual named insureds and that no such insurance is now in force.

(26) Further investigation by Wisconsin National indicated that certain portions of the commission received by Alan and Martin Luber had been paid over to the defendant, Jack Rosen, that Rosen was engaged in a scheme to defraud Wisconsin National, that Rosen had induced Alan and Martin Luber not to deliver the policies to the individual named insureds but instead to deliver the policies to him, Jack Rosen.

(27) On March 8, 1974, Wisconsin National sent out a confirmation letter to all persons whose applications for insurance had been obtained through the defendants and accepted by Wisconsin National and for whom Wisconsin National had issued policies of insurance.

(28) Those responses which were received indicated that no one had received any policy of insurance. An investigation which was carried out along with the letter campaign also indicated that no one of the individual named insureds procured through the Lubers and Jack Rosen and accepted by Wisconsin National and for whom policies had been issued had ever received such a policy of insurance.

(29) After February of 1974 no premiums were ever received by Wisconsin National on any insurance business which purportedly had been obtained from the defendants.

(30) The net balance due and owing Wisconsin National from the defendants are the commissions paid out less the premiums received and amounts to $115,071.83.

(31) Pursuant to an oral agreement between Alan Luber, Martin Luber and Jack Rosen, Alan Luber and Martin Luber paid Rosen an amount equal to 70 percent of the annualized premiums on

all business obtained through Rosen. On all business which Rosen obtained, he would send to the Lubers the application and the first monthly premium for each policy. Thereafter, premiums were billed to Rosen directly.

(32) The total amount paid by Alan Luber and Martin Luber to Jack Rosen pursuant to their agreement was $865,972.45 which amount is reflected by some cancelled checks and by signed receipts for cash payments.

(33) Subsequent to February 1974 Alan Luber and Martin Luber called approximately 50 to 60 people for whom policies of insurance had been issued by Capitol Life and by Wisconsin National and none of the people contacted knew anything about the insurance or had ever received policies issued to them.

(34) Pursuant to a stipulation of counsel and order of this Court entered on January 2, 1975, defendants Alan Luber and Martin Luber consented to the entry of a judgment in favor of Capitol Life against Martin and Alan Luber, jointly and severally, in the amount of $533,512.60, and they further consented to the entry of a judgment in favor of Wisconsin National and against Martin and Alan Luber, jointly and severally, in the amount of $116,238.81.

(35) On January 2, 1975 this Court entered an order granting the motion for sanctions filed by plaintiff and intervenor plaintiff against defendant Rosen, pursuant to Rules 37(d) and 37(b)(2)(C) of the Federal Rules of Civil Procedure, for failure to submit to the orders of this Court regarding discovery in this case. As a sanction, the Court entered judgment by default as to liability in favor of the plaintiff and the intervenor plaintiff and against defendant Rosen.

(36) On February 20, 1975 an assessment of damages hearing was held before this Court for the purpose of deter-

mining the amount of damages to which the plaintiff and intervenor plaintiff are entitled from defendant Rosen. At the hearing Mr. Danella, substituted counsel for defendant Rosen, was given permission to file a motion to open the judgment by default and dismiss on the pleadings on the limited basis that the pleadings failed to state a cause of action in fraud against defendant Rosen as to either Capitol Life or Wisconsin National. . . .

(37) The aforesaid motion to dismiss the pleadings was . . . denied today for the reasons earlier stated.

*[Conclusions of Law]*

■ (1) The advance and earned commissions which were paid by Capitol Life and Wisconsin National to Alan Luber and Martin Luber were for insurance policies which had never been delivered to the named insureds and for insurance which was never in force.

(2) As a direct and proximate result of these actions, defendant Rosen fraudulently induced Capitol Life and Wisconsin National to believe that the insurance policies which they had issued were in force and that Martin Luber and Alan Luber were therefore entitled to advance and earned commissions.

■ (3) The actions of Rosen in obtaining applications for insurance, in inducing Martin Luber and Alan Luber to deliver to him the insurance policies, and in inducing Martin Luber and Alan Luber to pay to him a total of $865,972.-45 out of such advance and earned commissions they received from Capitol Life and Wisconsin National were a direct and proximate cause of the losses incurred by Capitol Life and Wisconsin National.

■ (4) By inducing Alan Luber and Martin Luber to accept the insur-

ance applications but not to deliver the insurance policies to the named insureds and to pay to him a substantial portion of the advance and earned commissions paid to them by Capitol Life and Wisconsin National, Rosen was able to engage in a scheme to defraud Capitol Life and Wisconsin National.

(5) Defendant Rosen has received from Alan Luber and Martin Luber out of the advance and earned commissions paid to them by plaintiffs and intervenor plaintiff a total payment of $865,972.45.

(6) Capitol Life paid to Martin Luber and Alan Luber total advance and earned commissions of $793,566.93. Rosen has collected and remitted to Capitol Life what purport to be gross premiums totaling $284,459.13, and pursuant to the Home Loan Protection Agreement, Capitol Life has paid to Rosen collection fees totaling $3,091.29. The balance due and owing to Capitol Life by defendant Rosen amounts to $512,198.09 together with interest and costs.

(7) Wisconsin National has paid to Martin Luber and Alan Luber total advance and earned commissions of $157,075.08. Alan Luber and Martin Luber have remitted to Wisconsin National what purported to be gross premiums totaling approximately $42,003.25. The balance due and owing to Wisconsin National by defendant Rosen amounts to $115,071.83 together with interest and costs.

(8) Judgment is hereby entered in favor of Capitol Life Insurance Company and against Jack Rosen, individually and trading as Philadelphia Mortgage and Insurance Consultants, in the sum of $512,198.08.

(9) Judgment is hereby entered in favor of Wisconsin National Life Insurance Company and against Jack Rosen, individually and trading as Philadelphia Mortgage and Insurance Consultants, in the sum of $115,071.83.