**NATIONAL DEVELOPMENT COMPANY, Plaintiff,**

v.

**TRIAD HOLDING CORPORATION, Adnan M. Khashoggi, Triad Financial Establishment, Triad America Corporation, Triad International Marketing, Akorp, N.V., Ekorp, N.V., A.K. Holdings Ltd., Triad Foundation, Triad Condas, Edgington Oil Co., Handlingair Ltd., Uni–Triad Enterprises, and John Doe Khashoggi Entities 1–50, Defendants.**

**No. 86 Civ. 8270 (MP).**

United States District Court, S.D. New York.

June 11, 1990.

Jones, Day, Reavis & Pogue, New York City by Frederick Sherman, Thomas L. Abrams, for plaintiff.

Sidley & Austin, New York City by Steven Bierman, Mark Parry, James Paul Linn, Oklahoma City, Okl., for defendant Khashoggi.

## OPINION

MILTON POLLACK, Senior District Judge:

Defendant Adnan M. Khashoggi moves, pursuant to Rule 60(b)(4), Fed.R.Civ.P., to vacate two default judgments entered against him. Khashoggi claims that the Court lacked personal jurisdiction over him in the action and consequently that the default judgments were void and should be vacated.

The Court ordered that an evidentiary hearing be held.

For the reasons stated below, the default judgment compelling arbitration entered against Khashoggi on October 15, 1987 is sustained. The default judgment entered on August 2, 1989 in which an arbitration award of money damages was confirmed on a Supplemental Complaint which was not served as required by the Rules is vacated.

### Background

In 1983 or 1984, the National Development Company ("NDC"), a corporation wholly owned by the Government of the Philippines, and Adnan Khashoggi entered into negotiations for the formation of a joint venture trading company.

On May 16, 1984, NDC, Triad Holding Co. (an offshore corporation owned by Khashoggi) and Triad Asia, Ltd. (the joint venture entity) entered into a Shareholders Agreement by which NDC and Triad Holding each subscribed to one-half of Triad Asia's stock. The agreement provided that upon winding up, each shareholder was to receive a pro rata share of the assets after payment of all liabilities. Khashoggi's daughter, Nabila, executed the agreement on behalf of Khashoggi.

On November 22, 1984, NDC and Triad Holding entered into a Memorandum of Agreement reiterating the 50–50 nature of the venture and providing for arbitration if any disputes between the parties arose. Khashoggi executed the Memorandum on behalf of Triad Holding.

Triad Asia's capitalization eventually reached $7,000,000.00.

On March 17, 1986, the two shareholders agreed to dissolve Triad Asia and to distribute Triad Asia's assets "ratably" after payment of liabilities. On March 26, 1986, NDC directed Triad Asia's bank to transfer the entire proceeds of Triad Asia's account to Triad Holding's account. Triad Holding was then supposed to transfer NDC's one-half share to the account of Philippine As-

sociated Smelting & Refining Corp., another NDC company. Triad Holding never transferred the funds.

NDC made a request in August, 1986, that Triad Holding, Khashoggi and several other Khashoggi enterprises consent to arbitration of NDC's claim for one-half of Triad Asia's $7,000,000 in capitalization plus interest.

NDC filed a complaint in October 1986 in the Southern District of New York seeking to compel arbitration. Service of the initial summons and complaint, was attempted against Khashoggi at 641 Fifth Avenue, New York, N.Y. by delivery of a copy of the papers to Aurora DaSilva, the housekeeper or supervisor of five contiguous apartments on three floors of the Olympic Tower building at 641 Fifth Avenue, in New York ("the Olympic Tower apartment"). NDC also mailed a copy of the complaint addressed to Adnan Khashoggi at 641 Fifth Avenue, New York, N.Y.

In addition, NDC served the summons and complaint on Triad Holding Co. in 1986 at its headquarters in Geneva, Switzerland pursuant to letters rogatory.[1]

The premises at 641 Fifth Avenue, New York, N.Y., were owned by Akorp, N.V. Akorp, N.V., located in Curacao, the Netherlands Antilles, is 100% owned by A.K. Holdings Ltd., a Cayman Islands company which is in turn 100% owned by Adnan Khashoggi.[2]

The Olympic Tower apartment contained sleeping quarters, business equipment and facilities and social conveniences suitable for stop-over uses of short or longer duration. Khashoggi used this apartment 34 days in 1986. He is currently (in 1990)

occupying these premises while attending an ongoing criminal trial in this district.

Khashoggi made no appearance in the action and, on plaintiff's application, Judge Sprizzo entered a default judgment against him on October 15, 1987 directing arbitration.

The arbitration was held in London during February, 1989. Khashoggi did not appear at or participate in the arbitration. The panel found against Triad Holding and Khashoggi.

NDC, with the court's permission, filed a "Supplemental Complaint" in May, 1989, requesting a judgment confirming the arbitration award. NDC purported to serve the supplemental complaint by merely mailing it to Khashoggi to the Olympic Tower apartment and mailing another copy addressed to an attorney then appearing for Khashoggi in an unrelated criminal matter pending in this Court.

There was no appearance or answer filed by Khashoggi with respect to the Supplemental Complaint. On plaintiff's application, Judge Sprizzo entered a default judgment in favor of NDC on August 2, 1989 in the amount of $4,569,623.05 representing the arbitration award against Khashoggi.[3]

Khashoggi has now made a motion to vacate both default judgments pursuant to Rule 60(b)(4), Fed.R.Civ.P., on the grounds that each judgment is void because personal jurisdiction was lacking in each instance.[4] Khashoggi claims that the plaintiff failed to comply with the requirements of Rule 4, Fed.R.Civ.P., governing service of process, and failed to comply with Rule 5 with respect to the Supplemental Complaint, which invokes in this case the ser-

1. The arbitration panel found Triad Holding Co. to be Khashoggi's alter ego.

2. The briefs state that Akorp owns an apartment consisting of the 46th and 47th floors of Olympic Towers. In briefs that have been submitted previously, the apartment is described as containing three floors: 45, 46 and 47. It appears from the documents included with the affidavits that Akorp, N.V. owns the 46th and 47th floor apartments while Msl Investment, S.A., Ltd., a Panamanian corporation, owns the 45th floor. Khashoggi owns 100% of both corporations through his ownership of other corporations.

3. NDC has filed a duplicate lawsuit, *National Development Co. v. Adnan M. Khashoggi*, 89 Civ. 7457, seeking to confirm the arbitration award which was on Judge Sprizzo's Suspense Calendar until transfer of these motions to this Court.

4. Rule 60(b)(4) states:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order or proceeding for the following reasons; ... (4) the judgment is void....

vice of process requirements of Rule 4 with respect to a Supplemental Complaint. These motions were duly transferred to the docket of the undersigned for resolution.

### Discussion

A.  Service of Process

NDC claims that it made proper service of the summons and complaint under either Rule 4(c)(2)(C)(i) or Rule 4(d)(1), Fed.R. Civ.P.

Rule 4(c)(2)(C)(i) provides for service of process:

> pursuant to the law of the State in which the district court is held for the service ·of summons or other like process upon such defendant in an action brought in the courts of general jurisdiction of that State ...

The relevant New York State statute for service of process is N.Y. C.P.L.R. § 308 (McKinney 1987).  Subdivision 2 of § 308 provides for service of process:

> by delivering the summons within the state to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served and by ... mailing the summons to the person to be served at his last known residence ...

Rule 4(d)(1) of the Federal Rules provides for service of process similarly:

> [Service shall be made] Upon an individual other than an infant or an incompetent person ... by leaving copies [of the summons and complaint] at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein ...

1. *Service of Process Under Rule 4(d)(1)*

■ For service of the summons to be valid, the threshold question to be answered is whether the Olympic Tower apartment was Khashoggi's "dwelling place," "dwelling house," or "usual place of abode." [5]  While the federal and state rules use slightly different language, the courts

of both systems have looked to one another for guidance in construing the language. *See, e.g., First National Bank & Trust Co. v. Ingerton,* 207 F.2d 793, 794 (10th Cir.) (looking at state cases but finding them in "hopeless and irreconcilable conflict.").

The inquiry must begin with the facts before the court. *See Kleiner v. Daboul,* 82 B.R. 657, 660 (D.Mass.1987); *Capitol Life Ins. Co. v. Rosen,* 69 F.R.D. 83, 88 (E.D.Pa.1975); 4A C. Wright & A. Miller, *Federal Practice and Procedure* § 1083 at 10 (1987) (hereinafter Wright & Miller); *see also First National Bank & Trust Co. v. Ingerton,* 207 F.2d 793, 795 (10th Cir.1953) ("The difficulty, if any, arises as always when an established principle of law is applied to a given set of facts.").

The relevant facts are that Khashoggi or his business enterprises maintain offices and housing facilities in a dozen or more localities worldwide.  The facilities are maintained by the various Khashoggi entities and used both by Khashoggi himself and by various business associates and guests of Khashoggi for indeterminate stays and occasions.

Khashoggi's primary "residence" is his family compound in Riyadh, Saudi Arabia where he and his adult children each occupy villas.  This is the location where Khashoggi spent the greatest amount of time, three months, during 1986.  Khashoggi spent the next largest amount of time in 1986, two months, at his facilities in Marbella, Spain.

The Olympic Tower apartment was not owned personally by Khashoggi.  He did, however, effectively own 100% of the apartment through a string of corporations.  Khashoggi often received mail, both personal and business related, which reached him after being addressed to the Olympic Tower apartment and was then forwarded by one, Karl Peterson.  Business mail was forwarded to Khashoggi's offices in Switzerland and personal mail was forwarded to Saudi Arabia for Khashoggi.  The New York facilities included a "communications center" with telephones

---

5.  There is no dispute among the parties that Aurora DaSilva, the supervisor of the Olympic Tower apartment, was a person of suitable age and discretion.

and fax and telex machines for the use of those using to the apartment.

In 1986, Khashoggi entered the United States twice, both times on his Saudi Arabian passport with a visitor's visa. Altogether, he spent approximately thirty days at the Olympic Tower apartment in 1986 spread out over 7 different stays. The longest stays were for two eight day periods.

Khashoggi's infrequent and occasional use of the apartment would not seem to make it his "dwelling house," "dwelling place," or "usual place of abode." *United Triad Energy Corp. v. McNell*, 110 F.R.D. 382, 386 n. 6 (S.D.N.Y.1986) ("Although in some instances, a temporary residence may constitute a 'usual place of abode' ..., a sense of permanency, absent here is required."); *Hannah v. United States Lines Co.*, 151 F.Supp. 122, 123 (S.D.N.Y.1951) ("It appears that the authors of the rule had in mind in the phrase employed a synonym for 'home.'"); *accord Kleiner v. Daboul*, 82 B.R. 657, 660 (D.Mass.1987) ("[M]ost [courts] require the serving party to demonstrate more than mere ownership or occasional occupancy in order to show sufficiency of service under Rule 4(d)(1)."); *United States v. Mensik*, 57 F.R.D. 125, 127 (M.D.Pa.1972) ("usual place of abode is taken to mean the permanent residence of the party."); *see also First National Bank & Trust Co. v. Ingerton*, 207 F.2d 793, 794–95 (10th Cir.1953) (Federal cases "recognize that the word 'usual' has significance and must be given consideration in determining the validity of such service."). *Shore v. Cornell–Dubilier Elec. Corp.*, 33 F.R.D. 5 (D.Mass.1963) appositely noted that "[t]he cases make clear that it is not enough to leave a summons at a house that defendant owns or occupies from time to time. The house must be his usual and normal residence." *Id.* at 7.[6]

■ However, this does not end our analysis of the attempted service. While NDC may not have literally complied with Rule 4(d)(1), the evidence shows conduct calculated to give actual notice to Khashoggi after process had been delivered to a person of suitable age at the premises attributable to the defendant. Notice under those circumstances is the underlying purpose of Rule 4. *See, e.g., F.T.C. v. Compagnie de Saint–Gobain–Pont-a-Mousson*, 636 F.2d 1300, 1312 & n. 61 (D.C.Cir. 1980); 4 Wright & Miller, *supra* § 1063 at 225–26. To this end, Rule 4 "should be liberally construed in the interest of doing substantial justice." 4A Wright & Miller, *supra* § 1083 at 10. *See also Combs v. Nick Garin Trucking*, 825 F.2d 437, 446 (D.C.Cir.1987) (citing Wright & Miller); *Nowell v. Nowell*, 384 F.2d 951, 953 (5th Cir. 1967) ("4(d)(1) should be broadly construed where the defendant, as in this case, received notice of suit."), *cert. denied*, 390 U.S. 956, 88 S.Ct. 1053, 19 L.Ed.2d 1150 (1968). However, it is clear that notice alone is insufficient. *Martin v. New York State Dep't of Mental Hygiene*, 588 F.2d 371, 373 (2d Cir.1978) (per curiam) ("A

---

**6.** Some courts have followed a contrary line of cases that begins with *Pickford v. Kravetz*, 17 Fed.R.Serv. (Callaghan) 19 (S.D.N.Y.1952). In *Pickford*, the court, construing Rule 4(d)(1), stated:

> The terms "dwelling place" and "usual place of abode" are disjunctively stated in the rule and mean alternatives. The defendant has a place of abode in California but while he was staying in New York his dwelling place was in every sense [his] hotel.

*Id.* at 20.

Later cases relied on *Pickford* when construing N.Y. C.P.L.R. 308 subd. 2. *See Karlin v. Avis*, 326 F.Supp. 1325, 1329–30 (E.D.N.Y.1971). *See also Palandjian v. Pahlavi*, 586 F.Supp. 671, 676 (D.Mass.1984) (relying on *Karlin*).

But *Pickford* has been distinguished by both commentators and courts. They have stated that the holding was actually based on the court's finding that the hotel manager had colluded with the third party defendant to frustrate service. 2 J.W. Moore, *Moore's Federal Practice*, § 4.11[3] at 4–138 (2d ed. 1988); J. Weinstein, H. Korn & A. Miller, *New York Civil Practice* ¶ 308.13 at 3–232.17 n. 80; *Nowell v. Nowell*, 384 F.2d 951, 952 (5th Cir.1967) (citing Moore), *cert. denied*, 390 U.S. 956, 88 S.Ct. 1053, 19 L.Ed.2d 1150 (1968).

The New York Court of Appeals has implicitly rejected the holding in *Karlin*. *Mangold v. Neuman*, 57 N.Y.2d 627, 628, 439 N.E.2d 867, 868, 454 N.Y.S.2d 58, 59 (1982); *see also ITC Entertainment, Ltd. v. Nelson Film Partners*, 714 F.2d 217, 221 n. 3 (2d Cir.1983) (recognizing New York's rejection of *Karlin*).

showing that the defendant has had actual notice of the lawsuit is not sufficient....");  *cf. Concepcion v. VEB Backereimaschenbau Halle,* 120 F.R.D. 482, 485 (D.N.J.1988) ("[W]hile there must be substantial compliance with the rules of service, they are to be liberally construed where, as seems to be the case here, defendant has sufficient notice of the complaint.").

The burden is on the plaintiff to show that the mobile defendant was served with process through an appropriate agent of suitable age and discretion and thus received notice of the pending action and its content. *Cf. Light v. Wolf,* 816 F.2d 746, 751 (D.C.Cir.1987) (plaintiff has burden of proving service.); *Lehigh Valley Indus., Inc. v. Birenbaum,* 527 F.2d 87, 92 (2d Cir.1975) ("It is basic that the burden of proving jurisdiction is upon the party who asserts it and that he must show by the complaint and supporting affidavits the essential requirements of the jurisdictional statute."); Wright & Miller, *supra* § 1083 at 12 (1987).

The evidence adduced at the hearing revealed that Khashoggi, a world-wide traveler, regularly received both personal and business mail at the Olympic Tower apartment. Peterson, a part of the Olympic Tower apartment entourage, would pay any bills and forward the mail on to Switzerland or Saudi Arabia.

In this case, it is undisputed that the summons and complaint were served on Ms. DaSilva, the apartment supervisor. In addition, she testified without contradiction that after receiving the summons and complaint she passed them on to Peterson. This then shifted to Khashoggi a burden of explanation to show what Peterson did with them. There was no explanation. Peterson's absence from the hearing was unexplained as was his activity in the circumstances. This leaves the case in the posture where the plaintiff has succeeded in furnishing, even if just barely, sufficient evidence of service of process and implications of notice thereof to Khashoggi through a regular set-up.

**B. The Default on the Supplemental Complaint**

The complaint upon which a money judgment was entered upon alleged default is titled "Supplemental Complaint."

■ This "Supplemental Complaint" included the assertion of a new claim, that is, a claim for confirmation of the arbitral award. Since the Supplemental Complaint included a new claim, NDC was required by Rule 5(a), Fed.R.Civ.P.,[7] to serve the Supplemental Complaint on Khashoggi in the manner provided for service of summons, in Rule 4, Fed.R.Civ.P.

■ NDC made no attempt to serve a copy of the Supplemental Complaint in the manner provided for service of a summons by delivery thereof to a person of suitable age or discretion at an appropriate location. Instead, NDC merely mailed copies of the Supplemental Complaint addressed to Khashoggi at the Olympic Tower apartment and to Robert Morvillo, Esq., an attorney who had not appeared for Khashoggi in this action but had been retained to represent Khashoggi in a criminal proceeding pending in the Southern District of New York.[8] No copy was mailed to Khashoggi to his home in Saudi Arabia.

Rule 4(c)(2)(C)(ii) does provide for provisional mail service. However, NDC did not use this method:

[Service may be made] by mailing a copy of the summons and complaint (by first-class mail, postage prepaid) to the person to be served, together with two copies of a notice and acknowledgment ... If no acknowledgment of service under this subdivision of this rule is received by the sender within 20 days after the date of

---

**7.** Rule 5(a), Fed.R.Civ.P. states:
No service need be made on parties in default for failure to appear except that pleadings asserting new or additional claims for relief against them shall be served upon them in the manner provided for service of summons in Rule 4.

**8.** It is contended that Mr. Morvillo was not retained or authorized to represent Khashoggi or to accept service of process on his behalf in this civil matter.

mailing, service of such summons and complaint shall be made under subparagraph (A) or (B) of this paragraph or in the manner prescribed by subdivision (d)(1) or (d)(3).

Rule 4(c)(2)(C)(ii), Fed.R.Civ.P. No attempt was made to comply with this Rule and when no acknowledgment was received, NDC did not re-serve under one of the alternative provisions.

Nor did the mail service attempted satisfy the CPLR. The CPLR does not permit mail service absent an order of the court. N.Y. C.P.L.R. 308 subd. 5 (McKinney 1990).

Unlike the initial service of the summons and complaint in 1986 by delivery to the Olympic Tower apartment supervisor, there was not even a minimal effort to comply with the requirements of either the federal or the state statutes for service of the Supplemental Complaint. While a liberal approach should be taken to what constitutes compliance with the requirements of the federal statute, where plaintiffs have completely disregarded the mandates of the Rules it would be inappropriate to validate the attempt made here. Nor would it be appropriate to ignore the requirements of the state statute. *Feinstein v. Bergner*, 48 N.Y.2d 234, 241, 397 N.E.2d 1161, 1164–65, 422 N.Y.S.2d 356, 359–60 (1979) ("That Bergner subsequently received actual notice of the suit does not cure this defect, since notice received by means other than those authorized by statute cannot serve to bring a defendant within the jurisdiction of the court.").

### Conclusion

While the question whether there was an appropriate compliance with the Rules is close, the manner in which the plaintiff proceeded in serving the first summons and complaint at a place and on a suitable person arguably authorized by the defendant was calculated, and under the in-house practice could be expected, to give the notice of the suit which is the nub of the requirement under the federal rules.

So far as concerns the attempt to assert a Supplemental Complaint by the device of a purported amendment after the arbitra-

tion proceeding was completed, this service of the new complaint did not satisfy the applicable rules. The money judgment obtained by default was improperly procured and is void and is vacated with costs to the moving party. The demand for discovery under the Supplemental Complaint falls in accordance with this resolution.

So Ordered.