## In re CRAZY EDDIE SECURITIES LITIGATION.

Vivian **BERNSTEIN**, et al., Plaintiffs,

v.

Eddie **ANTAR**, et al., Defendants.

**OPPENHEIMER–PALMIERI FUND, L.P., Entertainment Marketing, Incorporated, and Elias Zinn, Plaintiffs,**

v.

**PEAT MARWICK MAIN & CO., et al., Defendants.**

Nos. 87 CV 0033, 91 CV 4450, 90 CV 3181 and 88 CV 3481.

United States District Court, E.D. New York.

Aug. 8, 1996.

**1158**

Sirota & Sirota (Howard B. Sirota, Saul Roffe, of counsel), New York City, Abbey & Ellis (Stephen T. Rodd, of counsel), New York City, for class plaintiffs.

Folkenflik & McGerity (Max Folkenflik, Margaret McGerity, of counsel), New York City, for plaintiff Entertainment Marketing, Inc.

Corbin Silverman & Sanseverino (John J. Gallagher, of counsel), New York City, for Dennis S. Faulkner, Trustee of KLH Computers, Inc. f/k/a Entertainment Marketing, Inc.

Leventhal Slade & Krantz (Larry Krantz and Thomas B. Wilinsky, of counsel), New York City, for plaintiff Elias Zinn.

Milbank, Tweed, Hadley & McCloy (C. Stephen Howard, David A. Jones, of counsel), Los Angeles, CA, for plaintiff Oppenheimer–Palmieri Fund, L.P.

Barry & McMoran (John J. Barry, Adam N. Saravay, of counsel), Newark, NJ, for defendant Eddie Antar.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

In a Report and Recommendation dated September 15, 1995, as amended by a Supplemental Report and Recommendation dated October 4, 1995, Magistrate Judge Marilyn Dolan Go recommended that judgment be entered against defendant Eddie Antar as follows: (a) judgment in favor of the class plaintiffs in the amount of $706,375,392.60, with interest at a rate of $43,515.132 per day from October 4, 1995; (b) judgment in favor of Entertainment Marketing, Inc. in the amount of $15,977,763.18, with interest at $1,793.50 per day from October 4, 1995; (c) judgment in favor of Elias Zinn in the amount of $4,559,038.20, with interest at $581.331 per day from October 4, 1995; and (d) judgment in favor of Oppenheimer–Palmieri Fund, L.P. in the amount of $15,686,-097.82, with interest at $1,733.901 per day from October 4, 1995.

The court has reviewed the Report and Recommendation as amended, has considered the objections of the parties, and agrees with its result.

The Clerk of the Court is directed to enter judgment against Eddie Antar in the amounts stated above.

So ordered.

## REPORT AND RECOMMENDATION REGARDING DEFAULT JUDGMENTS

GO, United States Magistrate Judge:

All remaining dispositive matters in this consolidated action have been referred to me for report and recommendation. The class plaintiffs and individual plaintiffs Entertainment Marketing, Inc. ("EMI"), Elias P. Zinn ("Zinn") and Oppenheimer–Palmieri Fund, L.P. ("Oppenheimer") have moved for a determination of the amount of damages and entry of default judgment against defendant Eddie Antar ("Antar").

Determination of these motions will bring to a close, at least in this court, the long and protracted litigations involving the fraudulent and negligent conduct of Antar and others in connection with the sale of securities in Crazy Eddie, Inc. ("Crazy Eddie" or the "Company"). The volumes of documents submitted to the court speak of the enormous efforts expended over nine years by armies of lawyers for both plaintiffs and defendants to bring this consolidated action to an end. Approximately 1,500 documents have been docketed in the nine actions consolidated in this court concerning Crazy Eddie, including numerous orders and decisions. Familiarity with the approximately twenty

reported opinions is assumed. *See In re Crazy Eddie Sec. Litig.*, 824 F.Supp. 320, 322 (E.D.N.Y.1993) and cases cited therein.

The damages calculated below provide some measure of the magnitude of the losses sustained by numerous purchasers of Crazy Eddie stock. However, the bare numbers do not reveal the extraordinary nature of the fraudulent scheme perpetrated upon the public by Antar, his relatives and associates, particularly since most of the facts presented in the instant motions and earlier proceedings are merely short and plain statements required by Rule 8. Nonetheless, even these dispassionate statements of Antar's deeds disclose a scheme remarkable not only for the substantial amounts misappropriated through fraud but for the brazenness of its perpetrators, among whom Eddie Antar clearly was the mastermind and instigator. Against this background, the amounts of the judgments against Antar recommended herein—totaling over $740,000,000—are neither excessive nor surprising. The extent to which the plaintiffs will be able to enforce these judgments is a remaining question to be resolved primarily in *Securities and Exchange Commission v. Eddie Antar, et al.*, Dkt. No. 89 Civ. 3773 (NHP) (D.N.J.) (the "SEC Action") brought, *inter alia*, to seize and repatriate assets that Antar has secreted in Europe. *See* Declaration of David A. Jones dated September 29, 1994 ("Jones Decl.") at ¶¶ 22–24 and Exhs. J, O, P and Q.

### PROCEDURAL BACKGROUND

The motions for default concern the claims raised in (1) a consolidated class action entitled *Vivian Bernstein, et al. v. Eddie Antar*, 87 CV 33 (the "Class Action"), brought on behalf of persons who purchased Crazy Eddie securities from September 13, 1984 through January 18, 1988 (the "Class Period"); and (2), a separate action entitled *The Oppenheimer–Palmieri Fund, L.P., et al. v. Peat Marwick Main & Co., et al.*, 88 CV 3481 (the "Individual Action"), brought by three

investors who purchased substantial amounts of Crazy Eddie securities in a "successful" takeover of the company. These two actions were consolidated for all purposes by the Court by order dated May 31, 1989.[1] Numerous cross claims were asserted among the various defendants in the first two actions.

On April 25, 1990, the Court entered a default against Antar in both actions for failure to comply with discovery obligations. The Court noted in its order that Antar had failed to appear for two scheduled depositions and "[h]is whereabouts are unknown," causing his counsel to move to withdraw. As subsequent events revealed, Antar had fled to Israel and, after involved extradition proceedings, was returned to the United States to face criminal charges in the District of New Jersey. *See United States v. Eddie Antar*, 53 F.3d 568, 570 (3d Cir.1995). On August 17, 1992, the Court also entered a default against Antar with respect to the cross claims asserted against him by Peat Marwick Main & Co. ("Peat Marwick") in both these actions. In entering both defaults, the Court deferred entry of judgment until the conclusion of this action.

In March 1993, all defendants except Antar entered into agreements to settle the Class Action, Individual Action, and two related class actions[2] not originally consolidated with this action. On June 11, 1993, this court approved a Stipulation of Settlement dated March 22, 1993 (the "Settlement") settling the claims in the Class Action, except those against Antar. *See In re Crazy Eddie*, 824 F.Supp. 320.

The plaintiffs in the Class Action (the "class plaintiffs") and the three plaintiffs in the Individual Action (Oppenheimer, EMI and Zinn, hereinafter collectively the "individual plaintiffs") have separately moved for default judgment against Antar. Defendant Peat Marwick has declined to move for entry of default judgment on its cross claim. After

---

1. A third action involving bankruptcy proceedings by Crazy Eddie against its auditors entitled *Crazy Eddie Inc. v. Peat Marwick Main & Co.*, 92 CV 75, was also consolidated with this action. No outstanding issues or claims remain in that action.

2. *Bernstein v. Eddie Antar*, 91 CV 4450, and *Bernstein v. Rose Antar*, 90 CV 3181.

the moving plaintiffs filed voluminous affidavits and supporting documentation, Antar, who had not participated in this consolidated action after his default, appeared through new counsel to request an extension of time to respond, which was granted. At a hearing on February 22, 1995, I determined that the calculation of damages on the claims in the Individual Action could be based on the written submissions. Notwithstanding Antar's argument that an evidentiary hearing was necessary, his counsel conceded at oral argument that the issues he raised as to the damages claimed in the Individual Action involved purely questions of law and no factual disputes. Tr. 2/22/95 at 23.[3]

However, I found that the submissions of the class plaintiffs failed to provide a sufficient basis to calculate damages, particularly with respect to damages sustained by plaintiffs who bought and sold securities within the Class Period. I directed the class plaintiffs and Antar to supplement their written submissions and scheduled an evidentiary hearing. At the inquest held on March 29, 1995, the class plaintiffs presented one witness, Candace Preston, an expert witness with Princeton Venture Research. Ms. Preston testified about the calculation of damages and the influence of external factors on the prices of Crazy Eddie securities. Antar did not present any witnesses or other evidence.

## DISCUSSION

### I. GENERAL CONSIDERATIONS

#### A. Legal Standards Governing Default

■ A default constitutes an admission of all well-pleaded factual allegations in the complaint, except for those relating to damages. Greyhound Exhibitgroup Inc. v. E.L.U.L. Realty, 973 F.2d 155, 158 (2d Cir. 1992), cert. denied, 506 U.S. 1080, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir.1981). Only "in very narrow, exceptional circumstances" may a court find an allegation

not "well pleaded." Trans World Airlines Inc. v. Hughes, 449 F.2d 51 (2d Cir.1971), rev'd on other grounds, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) (quoting with approval Trans World Airlines v. Hughes, 308 F.Supp. 679, 683 (S.D.N.Y.1969)).

■ Although a court has discretion to determine whether the facts alleged in a complaint state a valid cause of action, Au Bon Pain, 653 F.2d at 65, a defaulting party ordinarily cannot contest the merits of the plaintiff's claim absent "indisputable" contradictory evidence. Trans World Airlines, 449 F.2d at 63–64. Moreover, a default effectively constitutes an admission that damages were proximately caused by the defaulting party's conduct—that is, the acts pleaded in a complaint violated the laws upon which a claim is based and caused injuries as alleged. Id. at 69–70. The movant need prove "only that the compensation sought relate to the damages that naturally flow from the injuries pleaded." Greyhound, 973 F.2d at 159.

■ In determining damages not susceptible of simple mathematical calculation, Fed.R.Civ.P. 55(b)(2) gives a court the discretion to determine whether an evidentiary hearing is necessary. Action S.A. v. Marc Rich & Co, Inc., 951 F.2d 504, 508 (2d Cir. 1991), cert. denied, 503 U.S. 1006, 112 S.Ct. 1763, 118 L.Ed.2d 425 (1992), quoting Fustok v. ContiCommodity Services, Inc., 873 F.2d 38, 40 (2d Cir.1989). As long as there is a "sufficient basis from which to evaluate the fairness" of the sum awarded, a court may rely upon detailed affidavits and documentary evidence to determine damages. Id. By the same token, the moving party bears the burden of providing a reasonable basis for determination of damages and should not be awarded damages if the evidence is not adequate. The moving party is entitled to all reasonable inferences from the evidence it offers. Au Bon Pain, 653 F.2d at 65 (citing Trans World Airlines, 308 F.Supp. at 683).

---

**3.** References to page numbers in the transcripts of proceedings held will be preceded by "Tr." and the date.

### B. *Validity of Claims Asserted*

■ Although Antar has not specifically contested his liability under the complaints,[4] this court must first examine the validity of plaintiffs' claims to determine the extent of damages they are legally entitled to recover, including pre-judgment interest and treble damages. This task is simplified by the fact that this Court has previously ruled on the sufficiency of most claims raised in various complaints filed in both actions. These decisions establish the law of the case, from which no departure is warranted absent "weighty reasons." *In re Joint E.D. & S.D. Asbestos Litigation,* 18 F.3d 126, 130 (2d Cir.1994), *citing United States v. Adegbite,* 877 F.2d 174, 178 (2d Cir.), *cert. denied,* 493 U.S. 956, 110 S.Ct. 370, 107 L.Ed.2d 356 (1989). Though several of the prior rulings were made in the context of motions involving claims asserted against other defendants, they provide substantial guidance as to the sufficiency of the claims against Antar.

With respect to the Class Action, I will focus primarily on the claims asserted in the Second Amended Consolidated and Supplemental Complaint filed October 19, 1989 (the "Class Complaint"). The Class Complaint was the last properly filed complaint prior to Antar's default and no question arises over its applicability to these proceedings.[5] The class plaintiffs assert claims against Antar in the Class Complaint (as well as in their First Amended Complaint) under the Securities Act of 1933 (the Securities Act), 15 U.S.C. § 77a *et seq.;* Sections 10(b) and 20 of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. § 78a *et seq.,* and the rules promulgated thereunder; the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.,* and for common law fraud and misrepresentation.

In a decision issued on December 30, 1988 (the "December Order") addressing motions to dismiss claims asserted in the First Amended Complaint, the Court found that the class plaintiffs had adequately pleaded several of their claims against Antar and other defendants under federal securities law. *See Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962 (E.D.N.Y.1988), *vacated in part on other grounds,* 714 F.Supp. 1285 (E.D.N.Y.1989). In particular, the Court noted that allegations that the defendants had inflated Crazy Eddie's net income, overstated inventory, misrepresented the amount of store sales, milked money from Crazy Eddie and profited from insider sales satisfied the pleading requirements of Rule 9(b) of the Fed.R.Civ.P. with respect to the section 10(b) claims. *Id.,* 702 F.Supp. at 977–80. The Court held that these allegations likewise stated a claim for common law fraud. *Id.* at 982. The Court also found that the First Amended Complaint sufficiently alleged that Antar is a control person under sections 12(2) and 15 of the Securities Act, as well as under section 20(a) of the Exchange Act. *Id.,* 702 F.Supp. at 975 and 979. The securities claims in the Class Complaint are virtually identical to the claims alleged in the First Amended Complaint previously upheld by this court. *In re Crazy Eddie Sec. Litig.,* 747 F.Supp. 850, 853 (E.D.N.Y.1990).

Although this Court originally dismissed the RICO counts with prejudice in the December Order, 702 F.Supp. at 981–82, it later modified that holding after considering newly decided Second Circuit decisions. *In re Crazy Eddie Sec. Litig.,* 714 F.Supp. 1285 (E.D.N.Y.1989). The Court sustained the class plaintiffs' RICO conspiracy claim and

---

**4.** Antar merely contests reliance on plaintiffs' reference to his conviction in the District Court for the District of New Jersey in 1994 on multiple counts of RICO conspiracy, substantive RICO violations, securities and mail fraud conspiracy, securities fraud and mail fraud. The Third Circuit recently reversed the convictions and remanded for a new trial. *U.S. v. Antar,* 53 F.3d at 578. The government's motion for rehearing *en banc* is currently pending before the Third Circuit. This reversal, which was based on grounds other than sufficiency or admissibility of evidence, does not diminish the significance of the well pleaded allegations in the complaints or other evidence presented by plaintiffs in these inquests.

**5.** *See infra* beginning at 13 for discussion regarding post-default amendment of complaints. The court struck the third amended class complaint for failure to comply with Fed.R.Civ.P. 15. *In re Crazy Eddie Sec. Litig.,* 792 F.Supp. 197, 201 (E.D.N.Y.1992). In 1993, the class plaintiffs filed a motion for leave to file a fourth amended complaint which was not addressed by the court prior to settlement of the rest of this consolidated action.

gave these plaintiffs leave to replead the substantive RICO claim, concluding that they may be able to remedy the defects in the pleading by identifying which acts of securities fraud constituted predicate acts under RICO. *Id.,* 714 F.Supp. at 1292–93.

After the class plaintiffs filed the Class Complaint amending their RICO claims, the Court again entertained motions to dismiss by five individual defendants other than Antar. The Court found that the additional allegations in the Class Complaint sufficiently defined predicate RICO acts and stated claims against four of these defendants. *In re Crazy Eddie Sec. Litig.,* 747 F.Supp. 850, 862–62 (E.D.N.Y.1990). Although the Court dismissed the RICO claim against a fifth defendant (Solomon Antar) for failure to identify specific allegations of misconduct in connection with these predicate acts, there is no issue as to the extent of Eddie Antar's participation in the alleged fraudulent scheme. Antar is named in virtually every paragraph cited by the Court in the portion of its ruling sustaining the RICO claims. *See* Class Complaint, ¶¶ 49–92, 101–124. Thus the Court's prior rulings clearly establish, for purposes of this inquest, that the class plaintiffs have valid claims entitling them to damages against Antar for securities fraud, RICO violations and common law fraud.

■ In their complaint filed on November 3, 1988, the individual plaintiffs also asserted claims against Antar under Section 10(b) of the Exchange Act and for common law fraud and misrepresentation. Many of the factual allegations in this complaint regarding the fraudulent conduct of Antar and other officers and directors of Crazy Eddie are similar to those in the Class Complaint. For example, the complaint alleges that these defendants did not fairly present the company's condition in its 1986 and 1987 financial statements, mischaracterized wholesale sales as retail sales in order to inflate sales data, overstated inventory, and overstated the company's income. Individual Action Complaint, ¶¶ 37, 40. Such allegations, which this Court previously found to be sufficient to

state claims for securities fraud and common law fraud with respect to the Class Complaint, clearly also state valid claims against Antar in the Individual Complaint.

Furthermore, the additional submissions made by the three individual plaintiffs, especially the affidavit of Sam Antar dated August 16, 1992 ("Sam Antar Aff."),[6] provide particularly telling details regarding Antar's efforts in planning and carrying out the scheme to defraud the public. For example, with respect to the overstatement of inventory, Antar instructed others to inflate the inventory count for fiscal years 1985 and 1986 and, when the falsified inventory did not yield sufficiently high profits for 1986, set even higher target figures for the count. Sam Antar Aff. at ¶¶ 20–26. In 1987, Antar instructed others to arrange for the delivery of merchandise for inclusion in the phantom inventory count, knowing that the merchandise was to be returned. At Antar's direction, they also falsified documents indicating the return of products to the manufacturer which actually remained in inventory. *Id.* at ¶¶ 43–45.

Sam Antar described similarly blatant examples of Antar's role in overstating retail store sales, *Id.* at ¶¶ 31–39, and understating accounts payable. *Id.* at ¶¶ 40–41, 45–46. Moreover, Antar smuggled cash out of the country he had skimmed from the Company and, in efforts to make the Company more attractive to investors, manipulated the amounts skimmed to distort the Company's growth in earnings. *Id.* at ¶¶ 17–20. After the Securities and Exchange Commission commenced the SEC Action, Antar embarked on massive efforts to cover-up his misdeeds, including the destruction of documents which had been subpoenaed by the SEC and encouraging Sam Antar to lie under oath. *Id.* at ¶¶ 10–11, 47–49. These facts, together with the well-pled allegations in the individual plaintiffs' complaint, suffice to sustain the claims of the individual plaintiffs for both securities fraud and common law fraud.

**6.** This affidavit, which was filed in connection with the action entitled *In the Matter of the Extradition of Eddie Antar,* Cr. N. 92–347 (NHP)

(D.N.J.), is attached as Exhibit A to the Jones Decl. and as Exhibit C to the affidavit of Larry Krantz dated Oct. 14, 1994.

## C. *Amendment of Complaint*

EMI, Zinn and Oppenheimer asserted claims only for securities fraud and common law fraud in their original complaint filed in 1988. On January 20, 1993, this Court granted the motion of EMI and Zinn for leave to amend the complaint to assert RICO claims against Antar and other defendants, rejecting the arguments raised by defendant Peat Marwick that amendment would be futile. *In re Crazy Eddie Sec. Litig.*, 812 F.Supp. 338 (E.D.N.Y.1993). EMI and Zinn claim they are also entitled to damages based on the RICO claims in the Amended Complaint which was filed on February 9, 1993.

Whether judgment should also be entered on the new claims raised in the Amended Complaint requires consideration of Fed. R.Civ.P. 54(c):

> A judgment in default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment. Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings.

Courts and commentators are divided over whether Rule 54(c) permits entry of a judgment greater than that demanded in pleadings filed at the time of entry of default. Although the Ninth Circuit has interpreted Rule 54(c) strictly in prohibiting amendment of a demand for judgment after entry of default,[7] the Second Circuit and other courts have taken a more flexible approach, particularly where a defendant has appeared and participated at an inquest. In *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 78–79 (2d Cir.1971), *rev'd on other grounds*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), the Second Circuit upheld an increase of the *ad damnum* at the default hearing, noting:

> we are of the view that there is no sound basis for restricting TWA to the precise damages originally sought in a case where damages alleged were unliquidated, and where defendant did not default by non-

appearance, but rather because of non-compliance with discovery procedures, and indeed was granted a full trial on the question of damages established by its default.

*See also In re Dierschke*, 975 F.2d 181 (5th Cir.), *reh'g denied*, Nov. 19, 1992 (award of attorneys' fees not demanded in complaint upheld due to defendant's appearance at a hearing on damages); *Peitzman v. City of Illmo*, 141 F.2d 956, 962 (8th Cir.), *cert. denied*, 323 U.S. 718, 65 S.Ct. 47, 89 L.Ed. 577 (1944); *Sarlie v. E.L. Bruce Co.*, 265 F.Supp. 371, 377–78 (S.D.N.Y.1967); 6 Moore's Federal Practice ¶ 54.61 at 54–300–301 and ¶ 55.08 at p. 55–58, 55–59.

Underlying most of these decisions is the recognition that the reasons for liberal pleading requirements also apply in the default context and that, where adequate notice is provided, courts should afford relief on the merits rather than focusing on technical procedural concerns. *See* 6 Moore's Federal Practice ¶ 55.08 at p. 55–59 n. 3 ("When a party is represented at the hearing on damages the only reason to deny a motion to amend the damage claim appears to be the possibility that the defaulting party would not have defaulted if he had known the full extent of his exposure").

The liberal approach to a plaintiff's pleadings is illustrated in the Second Circuit's treatment of the claims raised in *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65–66 (2d Cir.1981). There, the plaintiff brought five claims in his original complaint: three for breach of contract in connection with three construction projects, a claim for fraud for one project and a claim for an accounting in connection with the two other projects. After entry of default for failure to comply with discovery, the district court denied plaintiff the opportunity to offer proof of damages for fraud as to a project for which plaintiff had only sought an accounting. The Second Circuit reversed, reasoning that "the complaint was sufficient to apprise all defendants that damages were sought as to [that] project." *Au Bon Pain Corp.*, 653 F.2d at

---

7. *See Fong v. United States*, 300 F.2d 400, 413 (9th Cir.), *cert. denied*, 370 U.S. 938, 82 S.Ct. 1584, 8 L.Ed.2d 807 (1962); *see also* 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2663 at (1983) (endorsing Ninth Circuit opinion).

65–66. The court also observed that the plaintiff had originally sought only an accounting due to a lack of knowledge of the exact damages, and therefore amendment of the pleadings in light of subsequent proof to permit such damages was proper. *Id.*

■ What Zinn and EMI seek in the instant case—recovery on a newly asserted theory of liability in order to secure the treble damages and attorney's fees available under RICO—goes well beyond what the Second Circuit and other courts have permitted in construing already pleaded allegations and claims broadly. Unlike the plaintiffs in *TWA*, Zinn and EMI are not simply seeking post-default amendment to increase their *ad damnum* damages, which were previously unliquidated due to lack of knowledge. Nor did they give notice that they sought treble damages under RICO in their original complaint prior to Antar's default. Even under the most liberal construction of EMI and Zinn's original complaint, there was no way to discern that claims under RICO or treble damages were sought.

Furthermore, EMI and Zinn clearly were cognizant that, as purchasers of Crazy Eddie securities, they might have had viable claims under RICO. The class plaintiffs asserted RICO claims in their various complaints long before Antar's default. After this court initially dismissed the RICO claims and later gave leave to replead on June 16, 1989, *see Bernstein*, 702 F.Supp. 962; *In re Crazy Eddie*, 714 F.Supp. 1285, the class plaintiffs asserted newly pleaded RICO claims in the Class Complaint filed on October 19, 1989. During this time, EMI and Zinn made the tactical decision not to assert RICO claims and did not change their position until late 1992, more than two years after Antar's default.

No sound reason exists for stretching caselaw to accord these plaintiffs a right to relief under claims asserted by *other* litigants prior to default. Such a rule would require courts to engage in needless inquiry to determine, *inter alia*, whether a defaulting defendant understood that claims raised by one plaintiff applied to other plaintiffs. A liberal approach in pleadings does not mean that a court should conjure elements of claims that were not pleaded in a complaint by design.

■ Moreover, Zinn and EMI failed to serve their amended complaint as required by Rule 5(a).[8] As admitted by counsel for Zinn, EMI and Zinn never served their amended complaint upon Antar. Instead of the required service, EMI and Zinn represent only that their amended complaint was annexed as an exhibit to a submission in connection with these default proceedings in October, 1994. Letter of Larry H. Krantz dated November 21, 1994 at 2. Courts have refused to give effect to amended complaints not properly served in accordance with Rule 5(a). *Varnes v. Glass Bottle Blowers Asso.*, 674 F.2d 1365, 1369 (11th Cir.1982); *International Controls Corp. v. Vesco*, 556 F.2d 665, 669 (2d Cir.1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 758 (1978); *National Development Co. v. Triad Holding Corp.*, 131 F.R.D. 408, 414 (S.D.N.Y.1990), *aff'd*, 930 F.2d 253 (2d Cir.), *cert. denied*, 502 U.S. 968, 112 S.Ct. 440, 116 L.Ed.2d 459 (1991); *Kleartex, Inc. v. Kleartex SDN BHD*, Dkt. No. 91 Civ. 4739, 1994, 1994 WL 733688 U.S.Dist. LEXIS 7996 *27, *28 (S.D.N.Y.1994). As the Second Circuit noted, an amended complaint supersedes a prior pleading and "renders it of no legal effect," but remains "inchoate" until served. *Vesco*, 556 F.2d at 668–69. Although that case involved improper personal service of an amended pleading upon a non-appearing party, certainly it is not unreasonable to expect compliance with the minimal requirements of service by mail permitted by Rule 5(b). Here, plaintiffs have completely disregarded the requirements of Rule 5 and are therefore not entitled to judgment based on claims in their amended complaint, particularly since the amended

---

8. Rule 5(a) provides in relevant part that:

Except as otherwise provided in these rules, every order required by its terms to be served, every pleading subsequent to the original complaint ... shall be served upon each of the parties. No service need be made on parties in default for failure to appear except that pleadings asserting new or additional claims for relief against them shall be served upon them in the manner provided for service of summons in Rule 4.

complaint contains a new claim seeking treble damages and attorney's fees.

Since there is no legal basis for considering EMI and Zinn's amended complaint, their damages in this proceeding will be based on the claims asserted in their original complaint.

### D. *Measure of Damages*

 Although damages in securities fraud actions may be calculated in several different ways, they ordinarily are based on out-of-pocket losses—that is, the difference between the purchase price and true value of the stock, or, if bought and sold, the gross economic loss adjusted to reflect that portion of loss attributed to market and other factors.[9] *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 297 (3d Cir.1991) (out-of-pocket expenses most common method); *Astor Chauffeured Limousine Co. v. Runnfeldt Inv Corp.*, 910 F.2d 1540, 1551 (7th Cir.1990) (same); *Pelletier v. Stuart–James Co.*, 863 F.2d 1550, 1557 (11th Cir.1989) (same); *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 48–50 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *Levine v. Seilon, Inc.*, 439 F.2d 328, 334 (2d Cir.1971); *see also Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436–38 (9th Cir.1987) (defining out-of-pocket expenses). Out-of-pocket losses is also the rule for damages caused by common law fraud. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995). Since RICO plaintiffs are only entitled to damages proximately caused by the predicate acts, *American Nat. Bank and Trust Co. v. Haroco, Inc.*, 473 U.S. 606, 609, 105 S.Ct. 3291, 3292, 87 L.Ed.2d 437 (1985), and the predicate acts claimed here are for securities fraud, plaintiffs' RICO damages are identical to their securities fraud damages.

 The class plaintiffs claim damages with respect to the purchase of Crazy Eddie securities between the initial public offering on September 13, 1984 and January 18, 1988 (the Class Period), when new management disclosed the Company's true financial condition. The members of the plaintiff class who bought and sold Crazy Eddie securities during the Class Period are entitled to recover their out-of-pocket losses, but adjusted to reflect the influence of market factors, including the general decline of retail consumer electronic stock.

 Unlike the typical securities fraud case where the fraud and misrepresentation merely inflated the price of the stock, Crazy Eddie securities became worthless not long after new management displaced Antar and his confederates. New management disclosed on January 18, 1988 that inventories had been overstated by $65 million and the Company's financial statements for prior years were false. The Company was eventually put into involuntary bankruptcy on June 23, 1989 and liquidated. Declaration of Dennis Faulkner dated October 13, 1994 ("Faulkner Decl.") at 7, ¶ 20. Given that reported net sales for the six month period ending August 30, 1987 were only $158.5 million, the massive overstatement of inventory (as well as understatement of accounts payable and inflation of store sales) served to perpetuate the existence of an insolvent company that was not viable. It is reasonable to infer that once Antar's fraudulent scheme was uncovered, there was no possibility that the company could survive. Thus, the purchasers of Crazy Eddie securities who purchased and held on to their shares are entitled to recover the full cost of their stock.

Courts have also awarded consequential damages where a plaintiff can demonstrate a "causal nexus [between the violation and the injury] with a good deal of certainty." *Zeller v. Bogue Electric Manufacturing Corp.*, 476 F.2d 795, 803 (2d Cir.), *cert. denied,* 414 U.S.

---

9. Other theories of calculating damages include: disgorgement of illegal profits *see Affiliated Ute Citizens v. United States*, 406 U.S. 128, 154–55, 92 S.Ct. 1456, 1472–73, 31 L.Ed.2d 741 (1972), benefit of the bargain expenses *Osofsky v. Zipf,* 645 F.2d 107, 114 (2d Cir.1981) and consequential damages *Zeller v. Bogue Electric Mfg. Corp.,*

476 F.2d 795, 803 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973). *See Panos v. Island Gem Enterprises,* 880 F.Supp. 169, 175 (S.D.N.Y.1995) (discussing alternative theories for awarding damages in securities fraud actions but stating that in general plaintiffs receive out-of-pocket losses).

908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *Chris–Craft Industries, Inc. v. Piper Aircraft Corp.*, 516 F.2d 172 (2d Cir.1975), *rev'd on other grounds*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); *James v. Meinke*, 778 F.2d 200, 206 (5th Cir.1985); *Academic Indus. v. Untermeyer Mace Ptnrs.*, Dkt. No. 90 Civ 1052, 1992 WL 73473 1992 U.S.Dist. LEXIS 3953 *5, *6 (S.D.N.Y. filed April 1, 1992). As discussed below, the individual plaintiffs are entitled to certain consequential damages in connection with their proxy fight to gain control of the Company as well as other expenses.

The class plaintiffs are also entitled to treble damages for their claim under RICO. 18 U.S.C. § 1964(c); *MDO Development Corp. v. Kelly*, 735 F.Supp. 591 (S.D.N.Y. 1990) (treble damages mandatory for violation of the Act).

### E. *Pre–Judgment Interest*

■■■■ The primary purpose for awarding pre-judgment interest is to compensate a plaintiff for the loss of the use of money. *West Virginia v. United States*, 479 U.S. 305, 310 n. 2, 107 S.Ct. 702, 706 n. 2, 93 L.Ed.2d 639 (1987); *Wickham Contracting Co. v. Local Union No. 3, IBEW*, 955 F.2d 831, 834 (2d Cir.), *cert. denied*, 506 U.S. 946, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992); *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 637 F.2d 77, 87 (2d Cir.1980). An award of pre-judgment interest must not overcompensate the plaintiff for her injuries. *Commercial Union Assurance Co. v. Milken*, 17 F.3d 608, 614 (2d Cir.1994); *Wickham*, 955 F.2d at 834. Under New York law, awarding pre-judgment interest on damages awarded for fraud is mandatory. *See Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 28 (2d Cir.1986); *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 693–95 (2d Cir.1983). Since all plaintiffs have asserted well pleaded pendent state claims for fraud, the class

plaintiffs, EMI, Zinn and Oppenheimer are entitled to pre-judgment interest as a matter of New York law.[10]

The plaintiffs also seek pre-judgment interest for their federal securities law claims, which is discretionary under both the Securities Act and the Exchange Act. *Blau v. Lehman*, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962); *Chris–Craft Industries, Inc.*, 516 F.2d at 190. Such an award is warranted with respect to the individual plaintiffs, but not the class plaintiffs, for the reasons discussed below.

■■■■ In determining whether to issue a discretionary award of pre-judgment interest, a court must evaluate a number of factors, including (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute, and (iv) other general principles deemed relevant by the court. *Wickham Contracting v. Local Union No. 3, IBEW*, 955 F.2d 831, 832–33 (2d Cir.1992). In the majority of cases where a plaintiff's damages are trebled, courts have found those damages sufficient compensation and have declined to award pre-judgment interest. *Trans World Airlines*, 449 F.2d at 80 (pre-judgment interest not necessary where treble damages were granted under the Clayton Act); *Bingham v. Zolt*, 810 F.Supp. 100, 102 (S.D.N.Y.1993); *Nu–Life Const. v. Board of Educ.*, 789 F.Supp. 103, 105 (E.D.N.Y.1992); *but see Tri Component Products Corp. v. Benarroch*, 1988 WL 126560 (S.D.N.Y.1988). Since the class plaintiffs are entitled to trebled damages under RICO, they will be more than adequately compensated for the loss of the use of their money invested in Crazy Eddie securities.

---

10. Implicit in this finding is the assumption that New York substantive law applies to this issue, at least with respect to the fraud claims in their entirety and the determination of pre-judgment interest below. Since no party has raised any choice of law issue, the parties, by their conduct, have acquiesced to the application of New York substantive law. *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 137 (2d Cir.1991). Because the plaintiffs are entitled to pre-judgment interest on their claims of common law fraud, I need not decide whether pre-judgment interest should be awarded on claims for negligent misrepresentation, which, in the case of the class plaintiffs, would require consideration of the law of states other than New York. *See In Crazy Eddie Sec. Litig.*, 135 F.R.D. 39, 41 (E.D.N.Y.1991).

The other important consideration here is fairness and equity. Given the magnitude of the fraud perpetrated by Eddie Antar, there is certainly some merit to the class plaintiffs' argument that awarding pre-judgment interest, in addition to treble damages, is justified. However, I cannot ignore the situations of the individual plaintiffs, who are not entitled to treble damages, and the fact that no plaintiff has any expectation of full recovery on her judgment. Instead, each will be able to collect only a fraction of her damages, primarily through the SEC Action which has resulted in repatriation of approximately $60 million to date. Brief of Eddie Antar in Opposition to Plaintiffs' Motion for Default Judgment at 3–4; Reply of EMI to Plaintiff Oppenheimer at 5. The trebling of the class plaintiffs' damages will increase their judgment out of proportion to that of the individual plaintiffs, even after considering the fact that the individual plaintiffs received a relatively greater proportion of their damages than the class plaintiffs under their respective settlement agreements with the other defendants. Thus, only the individual plaintiffs are entitled to pre-judgment interest on their federal securities claims.

Although denial of pre-judgment interest on the federal securities claims of the class plaintiffs will not affect their right to such interest under state law, the underlying reasons are pertinent to the treatment of pre-judgment interest under RICO. Whether pre-judgment interest should be trebled under RICO is an issue which apparently has not been decided by other courts. Although the Second Circuit has indicated that pre-judgment interest should not be awarded if the statutory basis for making the award is punitive in nature, the court has not decided whether the treble damage provision under RICO is punitive. *See Wickham*, 955 F.2d at 834; *Bingham v. Zolt*, 810 F.Supp. 100, 103 n. 2 (S.D.N.Y.1993); *Nu–Life Const v. Board of Educ.*, 789 F.Supp. 103, 104–05 (E.D.N.Y. 1992).

■ This question need not be reached, since pre-judgment interest is being awarded to the class plaintiffs pursuant to state law and not as an element of RICO damages. Moreover, a trebled award of discretionary pre-judgment interest is inappropriate for the same reasons that a discretionary award of pre-judgment interest is not warranted. Here, the class plaintiff' damages will be over $700,000,000, if pre-judgment interest is not trebled, and over one billion dollars if pre-judgment interest is trebled. The award of trebled damages, without trebled pre-judgment interest, is adequate to compensate the class plaintiffs for their damages. *See Wickham*, 955 F.2d at 834.

■ Whether pre-judgment interest is awarded under federal or state law, federal courts have ordinarily looked to state law in determining the appropriate interest rate. *See S.E.C. v. Musella*, 748 F.Supp. 1028, 1032 (S.D.N.Y.1989), *aff'd*, 898 F.2d 138 (2d Cir.), *cert. denied*, 498 U.S. 816, 111 S.Ct. 57, 112 L.Ed.2d 32 (1990). In the absence of a written contract which clearly specifies a different rate, pre-judgment interest should be awarded at the statutory rate of 9% authorized by CPLR § 5004. *Marine Management, Inc. v. Seco Management, Inc.*, 176 A.D.2d 252, 574 N.Y.S.2d 207 (2d Dept.1991), *aff'd* 80 N.Y.2d 886, 587 N.Y.S.2d 900, 600 N.E.2d 627 (1992).

New York CPLR § 5001(b), which governs awards of pre-judgment interest, provides that:

> Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

(McKinney 1992 & Supp.1995).

■ Due to the large number of members in the plaintiff class and the long Class Period, determination of precise dates for accrual of pre-judgment interest is almost impossible. Under these circumstances, the court has wide discretion in determining a reasonable date from which to award pre-judgment interest, and the date the action was commenced has generally been found to be appropriate. *Conway v. Icahn & Co.*, 16

F.3d 504, 512 (2d Cir.1994); *Cotazino v. Basil Dev. Corp.*, 167 A.D.2d 632, 562 N.Y.S.2d 988, 991 (3d Dep't 1990); *Della Pietra v. State*, 125 A.D.2d 936, 510 N.Y.S.2d 334, 337 (4th Dep't 1986), *aff'd*, 71 N.Y.2d 792, 530 N.Y.S.2d 510, 526 N.E.2d 1 (1988). Thus, pre-judgment interest should be awarded from January 7, 1987, the date of commencement of the Class Action.

■■■ The determination of the starting date from which the individual plaintiffs are entitled to pre-judgment interest is a simpler one. The individual plaintiffs purchased large blocks of Crazy Eddie stock over a short period of time, in connection with a proxy fight for control of the Company. Pre-judgment interest should be calculated from the date following each individual plaintiff's last purchase of stock, dates which are unambiguous and accurately represent when the individual plaintiffs first suffered damages. Thus pre-judgment interest should be awarded for Oppenheimer from October 1, 1987 to the present; for EMI from July 18, 1987 to the present; and for Zinn from October 7, 1987 to the present. *Id.* at 11; Declaration of Victor H. Palmieri dated September 27, 1994 at 3, ¶ 8 ("Palmieri Decl."); (listing dates Oppenheimer bought CEI stock).

### F. *Set-off of Settlement Amounts.*

■■■ EMI argues that there should be no reduction in its judgment for any settlement amount received from other defendants, because the set-off provisions of New York General Obligations Law § 15–108 (McKinney's 1989) do not apply here. Reply of Plaintiff EMI to Plaintiff Oppenheimer's Response at 4–6. Assuming that New York law governs,[11] EMI's argument that the payments made by other defendants was not for the "same injury" attributable to Antar makes little sense. While EMI is correct that the settlement encompassed negligence claims never asserted against Antar, the critical inquiry is the harm caused by the settling defendants rather than the difference in

theories of liability giving rise to the claims against them. The claims in negligence, fraud or misrepresentation all led to the same result—inflating the value of Crazy Eddie securities and defrauding innocent purchasers. Since the settled claims involve the same injuries and damages as those caused by Antar, some sort of set-off of the settlement payment is required.

The method for reducing the judgment to apply that set-off is more complicated. The Second Circuit in reviewing both *pro tanto* and proportionate reductions has applied a "one satisfaction rule"—that is, according a non-settling defendant at least a reduction in judgment equal to the amount of a prior settlement. *In re Masters Mates & Pilots Pension Plan,* 957 F.2d 1020, 1031, 1030–1031 (2d Cir.1992) (citing *Singer,* 878 F.2d at 600). The court has also suggested that a settlement may prescribe a particular judgment-reduction method as to non-settling defendants. *In re Ivan F. Boesky Securities Litigation,* 948 F.2d 1358, 1369 (2d Cir.1991). However, the Second Circuit has not specifically addressed the appropriate judgment-reduction method after the Supreme Court endorsed the proportionate judgment-reduction method in *McDermott, Inc. v. AmClyde,* 511 U.S. 202, 209–10, 114 S.Ct. 1461, 1466, 128 L.Ed.2d 148 (1994), an admiralty case. *See Bragger v. Trinity Capital Enterprise Corp.,* 30 F.3d 14, 17 (2d Cir.1994) (vacating order that judgment in securities fraud case be reduced on a *pro tanto* basis in light of *McDermott* ). Several other courts have followed *McDermott* in adopting a proportionate liability approach in securities fraud cases to deal with partial settlements. *Eichenholtz,* 52 F.3d at 487; *In re Del–Val Fin. Corp. Secs. Litig.,* 868 F.Supp. 547 (S.D.N.Y. 1994); *Cortec Industries Inc. v. Sum Holding L.P.,* 1994 WL 722708 at *1 (S.D.N.Y. 1994); *In re Kendall Square Research Corporation Sec. Litig.,* 869 F.Supp. 53, 54–55 (D.Mass.1994); *see also TBG, Inc. v. Bendis,* 36 F.3d 916 (10th Cir.1994).

---

11. The Second Circuit has applied federal law in determining the set-off available for partial settlements in federal securities actions. *Singer v. Olympia Brewing Co.,* 878 F.2d 596, 599–600 (2d Cir.1989), *cert. denied,* 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990); *see also Eichen-* *holtz v. Brennan,* 52 F.3d 478, 486 n. 14 (3d Cir.1995); *but see In re Jiffy Lube Securities Litigation,* 927 F.2d 155, 161 (4th Cir.1991) (state law considered with respect to the pendent common law fraud claims).

■ Although the proportionate rule in *McDermott* may ultimately be applied by the Second Circuit to securities fraud cases generally, it does not make sense to apply it in cases where the non-settling defendant wilfully defaulted by disregarding discovery obligations and impeded determination of liability. The reasons for not giving Antar the benefit of a proportionate reduction are particularly compelling given the unique circumstances of this case. More than five years have elapsed since Antar's default and two years since this court approved the class plaintiffs' settlement with the other defendants. Antar never objected to partial settlement of the Class Action or to entry of a judgment on June 11, 1993, which barred all further claims against the settling defendants with respect to the claims in this case. Nor has he raised the issue of proportionate fault vis-a-vis other defendants at any time in these proceedings. Clearly, none of the concerns of judicial economy, promotion of settlement or fairness discussed in *McDermott*, 511 U.S. at 211–14, 114 S.Ct. at 1467–69, would be served by engaging in proceedings to determine apportionment of fault now. In any event, given the considerable damages sustained by plaintiffs and Antar's unquestionably significant liability, the likelihood that the amounts recovered by plaintiffs in the SEC Action or otherwise will even approach a fraction of Antar's liability is remote, at best. Thus, for purposes of entry of judgment in this case, a *pro tanto* reduction for the settlement payments received is appropriate.

■ In cases where plaintiffs are entitled to trebled damages under federal law, courts have generally upheld the trebling of damages before crediting settlement payments. *Pyramid Securities Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1117 n. 3 (D.C.Cir.), *cert. denied*, 502 U.S. 822, 112 S.Ct. 85, 116 L.Ed.2d 57 (1991); *Singer*, 878 F.2d at 601

(analogy drawn to antitrust rule); *see also Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 894 (2d Cir.1988) (antitrust action); *New York v. Hendrickson Brothers, Inc.*, 840 F.2d 1065, 1086 (2d Cir.), *cert. denied*, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988) (antitrust action).[12] Thus, the settlement payment received by the class plaintiffs should be deducted only after the damages are trebled.

Oppenheimer argues that the settlement payments should first be set-off against prejudgment interest and then, any excess credited against principal. Oppenheimer Motion for Default Judgment at 13 n. 3. It incorrectly relies on *Spang Industries, Inc. v. Aetna Casualty & Surety Co.*, 512 F.2d 365, 371 (2d Cir.1975), and *Ohio Savings Bank & Trust Co. v. Willys Corp.*, 8 F.2d 463, 466–67 (2d Cir.1925) as authority for the proposition that partial payments should be credited first against interest due. *Ohio Savings Bank* involved the payment of debts where the court followed standard commercial practice of crediting payments first against interest. *Spang Industries* extended *Ohio Savings Bank* to a contract case where a specific payment was due on a specific date. Both cases dealt with situations where there was a clear obligation or debt as of a date certain.

■ Further extension of the narrow holding in *Ohio Savings Bank* to the settlement payments in this case for securities fraud and RICO claims is unwarranted. Given the large sums involved and the lapse of time since the settlement, treatment of the settlement payment has significant impact on the final judgments, particularly with respect to the individual plaintiffs. Since an award of pre-judgment interest is intended to compensate a plaintiff for the loss of the use of money, *West Virginia v. United States*, 479 U.S. at 310 n. 2, 107 S.Ct. at 706 n. 2, the receipt of a settlement obviously reduces

---

12. *But see Stochastic Decisions Inc. v. DiDomenico*, 995 F.2d 1158, 1165–66 (2d Cir.1993), *cert. denied*, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 334 (1993); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768–69 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995) (discussing *Stochastic*); *Commercial Union Assur. Co., plc v. Milken*, 17 F.3d 608, 612–13 (2d Cir.1994). These RICO

cases involved the collection of debt. The court therefore deducted amounts collected before trebling damages since the collection efforts were integral to the RICO injury. Significantly, the *Stochastic* court discussed a series of cases where an off-set was credited after trebling, and distinguished these cases because they did not involve the collection of debt. *Id.*

such loss to the extent of the settlement amount. Crediting the settlement payments against interest would result in overcompensating the plaintiffs for their injuries. *See Commercial Union Assurance Co. v. Milken,* 17 F.3d at 614. (2d Cir.1994); *Wickham,* 955 F.2d at 834. Thus, the settlement payments should be credited against principal as of the date of receipt.

### G. *Attorneys' fees and costs of this action*

■ A plaintiff may not recover attorneys' fees as damages in the absence of a statutory or contractual provision permitting their recovery. *Goldberg v. Mallinckrodt, Inc.,* 792 F.2d 305, 309 (2d Cir.1986). As all parties concede, the only possible basis for recovery of attorney's fees is under RICO, which permits recovery of the "costs of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). Thus, only the class plaintiffs are entitled to attorney's fees since they are the only party with a viable RICO claim against Antar for purposes of the instant proceedings. However, their counsel indicated that they were not pursuing the claim for attorney's fees in light of the fees previously awarded by the court after approval of the class settlement with the other defendants. Tr. 2/22/95 at 17.

In addition, all plaintiffs may recover costs to the extent permitted in 28 U.S.C. § 1920. These costs include filing fees, "fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case", witness fees and "copies of papers necessarily obtained for use in the case." 28 U.S.C. § 1920. The taxation of these costs is within the discretion of the court. *Pershern v. Fiatallis North America, Inc.,* 834 F.2d 136 (8th Cir.1987); *SCA Services, Inc. v. Lucky Stores,* 599 F.2d 178 (7th Cir.1979); *Hodge v. Seiler,* 558 F.2d 284 (5th Cir.1977).

EMI has claimed $70,000 as an expense for the costs of stenographic transcripts and copying. *See* Faulkner Decl. at 7–8, ¶ 22. However, neither EMI nor any other plaintiff has submitted a bill of costs, which is typically submitted to the Clerk of the Court immediately after entry of judgment. In the interest of facilitating entry of final judgments, any plaintiff intending to submit a bill of costs to the Clerk of the Court must do so by September 29, 1995. If there is opposition, the parties are directed to forward copies of their submissions to me by October 6, 1995.

■ In this regard, I note that although many of these expenses were incurred after Antar's default, imposition of these costs is appropriate since Antar will benefit from the off-sets derived from the settlements with other defendants which were clearly the result of litigation efforts both before and after his default. Any plaintiff seeking reimbursement must make a showing that deposition transcripts and copies were "necessarily obtained for use in th[is] case," 28 U.S.C. § 1920, and are not duplicative.

### II. *Calculation of the Class Plaintiffs' Damages*

■ The class plaintiffs seek damages only for their direct losses suffered from their purchase of Crazy Eddie securities. To prove their losses, they rely on the proofs of claim submitted by class members in accordance with the Settlement reached with other defendants. Under the Settlement, only certain losses are recognized and compensable; class members had to submit their proofs of claim with supporting documentation to a designated Claims Administrator. *See* Settlement at ¶¶ 18, 21(a)–(b). In cases where Crazy Eddie stock was purchased and sold during the Class Period, class members were entitled to claim the loss resulting from the difference between the purchase and selling price. However, the recognized loss for stock purchased but not sold during the Class Period is the difference between the purchase price and $1.75 (representing the price of Crazy Eddie common stock following the date of the January 18, 1988 announcement). *Id.* at ¶ 18.

According to Brad Heffler of Heffler & Co., the designated administrator of the Settlement, valid proofs of claim totaling $242,100,072.26 in claimed losses were received.[13]

---

**13.** Although Mr. Heffler broke down those claims between timely claims ($231,212.431.41) and late

The class plaintiffs argue that 78.93% of that total loss (which comes to $191,009,439) is attributable to the fraud perpetrated by defendants, after accounting for the effect of market forces on the price of Crazy Eddie securities. The proposed percentage adjustment is based on the expert testimony of Candace Preston, a researcher at Princeton Venture Research ("PVR"), given at a hearing on March 29, 1995. Ms. Preston described the stock trading model that her firm developed to project the damages sustained by the class plaintiffs. This model is based on the equal probability theory—*i.e.*, that each share has an equal probability of trading on any given day. Tr. 3/29/95 at 7–13; Pl.'s Exh. 1. In order to measure the extent to which the price decline in Crazy Eddie stock was due to a general market decline, PVR utilized an index based on the stock of ten comparable companies constituting all of the publicly traded consumer electronic retailers during the Class Period. Using this index to project the performance of Crazy Eddie stock under prevailing market conditions, PVR calculated the effect of Antar's fraud on Crazy Eddie stock prices by comparing actual sales price with the projected performance adjusted for market conditions. Tr. 3/29/95 at 10, 13, 17. That difference, measuring the impact of Antar's fraud on stock price, shall be called the "fraud inflation factor." PVR then calculated selling damages as the lesser of the difference between the actual purchase and sale prices or the difference between the fraud inflation factor per share on the purchase and sale dates. Pl.'s Exh. 1. Damages for shares held through the end of the Class Period ("retention damages") were based on the number of shares at the end of the class period multiplied by the projected fraud inflation factor per share on the date of purchase. *Id.* PVR did not ascribe any dam-

ages to sales made before November 11, 1986, the date of the first negative partial disclosure by the Company. Tr. 3/29/95 at 14, 23.

Using this model, PVR calculated damages with respect to the sale of Crazy Eddie common stock on each trading day during the class period. PVR arrived at $263,976,712 in selling damages and $24,941,512 in retention damages, for a total of $288,918,224 in damages with respect to purchase of Crazy Eddie stock by class members. *See* Pl.'s Exh. 4. In a comparable fashion, PVR projected damages for the sale of Crazy Eddie convertible debentures by utilizing the Value Line Convertible Index as a basis for projecting performance. Tr. 3/29/95 at 36–41. The amount of projected loss with respect to the debentures was $46,129,500. Thus, the class's total projected losses come to $335,-047,724. In addition, PVR calculated losses in the trading of Crazy Eddie securities, irrespective of market factors, and projected total losses of $424.5 million for shares and debentures traded during or retained at the end of the class period. The class plaintiffs arrived at the 78.93% adjustment for market factors based on the ratio between the total projected damages of $335 million, taking into account market factors, and total projected trading losses of $424.5 million.

Ms. Preston's testimony, which I found to be credible, provided a reasonable basis for calculating the effect of market factors on actual losses. Although, as was pointed out in cross-examination, PVR's calculation of selling damages is inexact, at best, the determination of damages upon default does not require mathematical precision. Absolute certainty is not possible in complex economic determinations such as quantifying the influence of market factors on a stock's price in this or any other case.[14]

claims ($9,922.790.90), that distinction is not relevant since the filing deadline is a limit only for purposes of the Settlement. Antar was not a party to that agreement and is not entitled to disallowance of claims deemed late under that Settlement. *See Otherson v. Dept. of Justice,* 711 F.2d 267, 274 (D.C.Cir.1983) (unlitigated issue in stipulation did not give rise to collateral estoppel); *Sekaquaptewa v. MacDonald,* 575 F.2d 239, 247 (9th Cir.1978); *Red Lake Band v. United States,* 607 F.2d 930, 934 (U.S.Ct.Cl.1979).

14. *See, e.g.,* various critiques of stock trading models utilized in securities fraud cases: Janet Cooper Alexander, *The Value of Bad News in Securities Class Actions,* 41 UCLA Law Review 1421 (1994); Kenneth R. Cone and James E. Laurence, *How Accurate are Estimates of Aggregate Damages in Securities Fraud Cases,* 49 The Business Lawyer 505 (1994); Dean Furbush and Jeffrey W. Smith, *Estimating the Number of Damaged Shares in Securities Fraud Litigation: An*

In any event, the losses presented in the proofs of claim provide a concrete starting point for evaluation, by giving tangible evidence of the actual losses sustained by investors.[15] On any view of the facts, the machinations of Antar and his co-defendants resulted in a meteoric rise in Crazy Eddie stock from an initial offering price of $2.00 to over $20 in mid–1986, then declined to zero when the stock ceased to be traded as of August 24, 1989. *See* Pl. Exh. 4. Given the outrageous distortion of the Company's financial condition by Antar and his co-defendants, which contributed to exaggerated upward and downward movements in the price of Crazy Eddie securities, I find that there is a reasonable basis for attributing only 21.03% of the price decline in Crazy Eddie securities to market influences. The balance of the losses sustained by the class plaintiffs is attributable to the fraud of the defendants. *See* Tr. 3/29/95 at 26.

■ Thus, I conclude that $191,009,439 is an appropriate measure of the damages sustained by the class plaintiffs. Although Judge Politan at Antar's sentencing found that damages caused by Antar amounted to $121 million, *see* Exh. B attached to the Declaration of Adam N. Saravay dated December 29, 1994, that determination is not controlling here for many reasons. Judge Politan stated that his finding was a conservative estimate which was made for the purposes of applying the federal sentencing guidelines. The context here is quite different. Nor did Judge Politan have the benefit of the PVR research or information regarding the proofs of claim filed in the Class Action before making his determination. Since Antar did not submit to me any of the information and opinions upon which Judge Politan relied, I cannot evaluate the basis for the judge's findings in light of the evidence presented in these proceedings.

■ Last, I note that Judge Politan made his calculation by offsetting the total losses by estimated gains realized by purchasers, less a $23 million deduction for the gains of Antar and other defendants.[16] While such an off-set may be appropriate for purposes of sentencing in a criminal case, Antar presents no reason why he is entitled to this off-set here, let alone why a perpetrator of securities fraud would generally have any off-set against the class merely because there were some purchasers fortunate enough not to have been injured. The victims of Antar's fraud clearly have been damaged and the fact that other purchasers of Crazy Eddie securities may have derived financial benefit, as did Antar, does not mitigate the damages that were sustained by the injured class members.

I recommend that entry of judgment in favor of the class plaintiffs in the amount of $706,375,392.60, as of October 4, 1995, which is calculated as follows:

| | |
|---|---:|
| Total Damages | $ 191,009,439.00 |
| Trebling under RICO | X 3 |
| Total Damages | 573,028,317.00 |
| Prejudgment interest from 1/7/87 to 12/13/93 (2,532 days at $47, 098.218/day) | 119,158,491.50 |
| Settlement payment received on December 13, 1993[17] | (14,531,403.00) |
| Prejudgment interest from 12/13/93 to 10/4/95 on principal balance of total damages (before trebling) equal to $176,478,036 (660 days at $43,515.32/day) | 28,719,987.12 |
| Total Damages | $706,375,392.60 |

*Introduction to Stock Trading Models,* 49 The Business Lawyer 527 (1994); Baruch Lev & Meiring de Villiers, *Stock Price Crashes and 10b–5 Damages: A Legal, Economic, and Policy Analysis,* 47 Stanford L.Rev. 7 (1994).

15. The losses recognized in the proofs of claim for securities not sold during the Class Period may, in fact, be far lower than actual losses. The settlement measured loss as the difference between purchase price and $1.75, a value based on the presumed market price of the stock at the end of the Class Period, even though the price of Crazy Eddie securities continued to decline thereafter. The class members who held on to their shares until the bitter end were left with worthless stock and should be entitled to claim the full purchase prices paid as damages, without any deduction of $1.75.

16. The $23 million dollar figure appears to be quite low based on available evidence in this case. According to the Class Complaint, Antar realized over $72.2 million in proceeds from the sale of Crazy Eddie shares, received a charitable deduction of $6.1 million for donated shares, and realized proceeds of $4.2 million in accounts as to which he acted as custodian. *Id.* at ¶ 17. Other relatives and co-defendants, Sam Antar, Mitchell Antar, Solomon Antar, Sam E. Antar and Allen Antar also realized total proceeds of approximately $20 million. *Id.* at ¶¶ 18–23.

### III. *Calculation of EMI's Damages*

Plaintiffs in the Individual Action claim damages for the losses sustained in purchasing Crazy Eddie stock and the expenses incurred in waging the proxy fight for control of the Company. EMI also claims as damages expenses incurred on behalf of the Company after new management took over on November 6, 1987.

▉ The primary issue presented is whether the incidental expenses incurred are sufficiently connected to Eddie Antar's fraud so as to constitute consequential damages. I find that the facts surrounding the takeover demonstrate that the individual plaintiffs were induced by Antar's fraud to purchase Crazy Eddie stock and to engage in a proxy fight to gain control of the Company.

EMI, now known as KLH Computers, was in the consumer electronics business in Houston, Texas. Faulkner Decl. at 1, ¶ 2. In the spring of 1987, Zinn, EMI's President and Chief Executive Officer, began investigating the possibility of investing in Crazy Eddie on behalf of EMI and for his own account. *Id.* Zinn had examined the balance sheets of the Company and concluded that Crazy Eddie was in sound financial condition but poorly managed. Palmieri Decl. at 2–3, ¶¶ 5–7; Faulkner Decl. at 1–2, ¶¶ 2–3. Eddie Antar had resigned from his post as President and Chief Executive Officer of Crazy Eddie in December 1986 and left Mitchell Antar, Sam E. Antar and Isaac Kairey to run the Company. Palmieri Decl. at 1–2, ¶¶ 3–7.

In August 1987, Zinn approached Oppenheimer for assistance in a proxy fight to take control of Crazy Eddie. The stock had fallen from a high in the low twenties in mid–1986 to approximately five dollars a share in August, 1987. Palmieri Decl. at 2–3, ¶¶ 5–7; Faulkner Decl. at 2–3, ¶¶ 5–6. The individual plaintiffs predicted that taking over the Company and replacing current management with professional managers could lead to a turnaround in the company and a dramatic increase in the value of Crazy Eddie stock. Palmieri Decl. at 2–3, ¶¶ 5–7.

I find there is a direct nexus between Antar's fraud regarding the Company's financial condition and the individual plaintiffs' decision to engage in a proxy contest to take over a company built on a foundation of lies and distortion. The individual plaintiffs are thus entitled to reasonable expenses incurred in the amounts set forth below.

In the case of EMI, I recommend that the following expenses relating to the proxy fight set forth in the Faulkner Decl. at 3–5, ¶ 7 be allowed:

| | |
|---|---:|
| Fees to Akin Gump | $ 455,332.96 |
| Fees to Sheriff Friedman | 47,500.00 |
| Fees to Lauren Advertising | 62,467.81 |
| Fees to Dean Witter | 300,000.00 |
| Fees to Drexel Burnham | 350,000.00 |
| Fees to Packard Press | 15,487.50 |
| Fees to Young Conway | 87,699.77 |
| Miscellaneous expenses | 31,560.80 |
| Total proxy expenses | $1,350,048.84 |

EMI is entitled to its expenses incurred in its investigation of the Company before it approached Oppenheimer for assistance in the proxy fight, as well as its share of expenses incurred jointly with Oppenheimer, in connection with the proxy fight. However, the allowed expense for fees paid to Akin Gump has been reduced to include only the fees related to the proxy fight and not an unrelated matter which apparently was mistakenly added to the claimed amount. Tr. 2/22/95 at 28. In addition, some of the claimed miscellaneous expenses have been disallowed because of a lack of supporting documentation (e.g., Benjamin Reporting bills) or lack of a clear relation to the proxy fight since they were expenses incurred after the individual plaintiffs took control of the Company. The claim for $5,829.62 paid to Shearson Lehman Brothers is also disallowed since the documentation does not show how the expenses were related to Crazy Eddie in any way, and in fact, includes expenses for a period long after the Company went into bankruptcy. An itemization of the allowed fees and mis-

---

**17.** No off-set for settlement payments received for attorney's fees and litigation expenses are included in these calculations, since the claimed damages do not include these items.

cellaneous expenses is set forth in an addendum to this Report.

■ I find that certain expenses claimed by EMI after it took over management of Crazy Eddie are too attenuated from Antar's fraud to be recoverable as consequential damages. These expenses include $27,000.00 in legal fees paid to Pryor Cashman, $192,-533.95 paid to Nintendo on an invoice for goods to Crazy Eddie, and $152,388.40 for unpaid bills to EMI for inventory sold to Crazy Eddie. Faulkner Decl. at 6–9, ¶¶ 17–19, 23. While I agree that EMI would never have incurred those expenses had it not succeeded in gaining control over the Company, EMI's actions were taken long after it became aware of the true condition of the Company. Since consequential damages require proof of a sufficient casual connection, damages suffered "but for" Antar's fraud, without more, should be disallowed. Thus, I recommend awarding a total amount of $1,350,048.84 in consequential damages. Since these incidental expenses were incurred and paid over a period of time, I recommend that pre-judgment interest on consequential damages be calculated from November 6, 1987, the end date of the proxy fight, which reflects a reasonable intermediate date under the circumstances.

Thus, I recommend that judgment be entered in favor of EMI and against Antar in the amount of $15,639,495.69, as of October 4, 1995, which is calculated as follows:

| | |
|---|---|
| Purchase of Stock | $12,276,073.00 |
| Incidental expenses | 1,350,048.84 |
| Total Damages | 13,626,121.84 |
| Settlement payment received | (6,550,000.00) |
| Principal balance | 7,076,121.84 |
| Interest on cost of stock from 7/18/87 to 11/5/87 (111 days at $3,026.977/day) | 335,994.45 |
| Interest on total damages from 11/6/87 to 3/30/93 (1972 days at $3,359.866/day) | 6,625,655.75 |
| Interest on principal balance from 3/31/93 to 10/4/95 (918 days at $1,744.797/day) | 1,601,723.65 |
| Amount of Judgment as of 10/4/95 | $15,639,495.69 |

### IV. Calculation of Zinn's Damages

Zinn's damages consist of the cost of the Crazy Eddie stock he acquired, plus pre-judgment interest from October 7, 1987, less the amounts realized from sale of 315,000 shares in 1989 credited as of the last day of sale (August 24, 1989) and $950,000 received in the settlement with other defendants on June 11, 1993. I recommend that the amounts claimed by Zinn for the purchase of his Crazy Eddie stock be allowed in full, see Affidavit of Elias Zinn dated October 13, 1994 at 2–8, ¶¶ 4–6, 7, 13, and that judgment be entered in favor of Zinn against Antar in the amount of $4,559,038.20, as of October 4, 1995, calculated as follows:

| | |
|---|---|
| Purchase of Stock (Total damages) | $3,427,712.50 |
| Sale of stock | (120,089.75) |
| Interim principal balance | 3,307,622.75 |
| Settlement payment received | (950,000.00) |
| Principal balance | 2,357,622.75 |
| Pre-judgment interest on total damages from 10/7/87 to 8/24/89 (686 days at $845.189/day) | 579,799.65 |
| Pre-judgment interest on interim principal balance from 8/25/89 to 6/11/93 (1751 days at $815.578/day) | 1,130,391.11 |
| Pre-judgment interest on principal balance from 6/11/93 to 10/4/95 (845 days at $581.331/day) | 491,224.69 |
| Amount of Judgments as of 10/4/95 | $4,559,038.20 |

### V. Calculation of Oppenheimer's Damages

Oppenheimer's damages consist of the cost of its Crazy Eddie stock and incidental damages, plus pre-judgment interest, less the amounts received in the settlement with other defendants on June 3, 1993. I recommend that the amounts claimed by Oppenheimer for these expenses be allowed in full, see Palmier Decl. at 3–4, ¶¶ 8–9, and that pre-judgment interest be awarded from October 1, 1987 on the stock purchase and from November 6, 1987 on the incidental expenses. Judgment should be entered in favor of Oppenheimer against Antar in the amount of $15,925,597.10, as of October 4, 1995, calculated as follows:

| | |
|---|---|
| Purchase of Stock | $12,935,698.50 |
| Incidental expenses | 1,128,474.15 |
| Total Damages | 14,064,172.65 |
| Settlement payment received | (7,032,241.00) |
| Principal balance | 7,031,931.65 |
| Pre-judgment interest on cost of stock from 10/1/87 to 11/6/87 (37 days at $3,189.624/day) | 118,016.89 |
| Pre-judgment interest on total damages from 11/6/87 to 6/3/93 (2036 days at $3,467.878/day) | 7,057,131.73 |
| Pre-judgment interest on principal balance from 6/4/93 to 10/4/95 (853 days at $1,733.901/day) | 1,479,017.55 |
| Amount of Judgment as of 10/4/95 | $15,686,097.82 |

### CONCLUSION

For the foregoing reasons, I recommend that judgment be entered against Antar as follows: (a) judgment in favor of the class plaintiffs in the amount of $706,375,392.60,

with interest at a rate of $43,515.132 per day from October 4, 1995; (b) judgment in favor of EMI in the amount of $15,639,495.69, with interest at a rate of $1,744.797 per day from October 4, 1995; (c) judgment in favor of Zinn in the amount of $4,559,038.20, with interest at a rate of $581.331 per day from October 4, 1995; and (d) judgment in favor of Oppenheimer in the amount of $15,686,-097.82, with interest at a rate of $1,733.901 per day from October 4, 1995.

Copies of this Report and Recommendation have been mailed to the parties on this date. Any objections must be filed with the Clerk of the Court, with a copy to the undersigned, by October 3, 1995. Failure to file objections within the specified time waives the right to appeal. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b).

Dated: Brooklyn, New York

September 15, 1995

## ADDENDUM

### ALLOWED EXPENSES CLAIMED BY EMI

A. Fees to Akin Gump

| | | |
|---|---|---|
| June 27, 1987— | expenses | $ 439.01 |
| | fees | 16,116.00 |
| July 27, 1987— | expenses | 4,364.87 |
| | fees | 33,129.50 |
| Aug. 28, 1987— | expenses | 6,306.62 |
| | fees | 52,305.00 |
| Sept. 24, 1987— | expenses | 3,887.54 |
| | fees | 24,729.50 |
| Oct. 27, 1987— | expenses | 11,723.46 |
| | fees | 109,265.00 |
| Nov. 17, 1987— | expenses | 23,772.79 |
| | fees | 94,215.00 |
| Dec. 12, 1987— | expenses | 22,973.46 |
| | fees | 44,936.50 |
| Jan. 22, 1988— | expenses | 2,775.57 |
| | fees | 747.50 |
| Mar. 20, 1987— | expenses | 2,147.64 |
| | fees | 1,498.00 |
| Total | | $ 455,332.96 |

B. Miscellaneous Expenses

| | |
|---|---|
| American Express 09/16/87 | $ 460.42 |
| American Express 10/16/87 | 1,888.55 |
| Andrea Baker 09/16/87 | 46.00 |
| Andrea Baker 09/16/87 | 23.54 |
| Diners Club 10/16/87 | 3,155.50 |
| Diners Club 11/13/87 | 14,372.86 |
| Diners Club 12/15/87 | 2,414.50 |
| Diners Club 01/29/88 | 2,474.00 |
| Julius Zinn 01/31/88 | 489.03 |
| Julius Zinn 02/28/88 (partial allowance) | 103.83 |
| Maryland Bank 06/06/87 | 2,751.61 |
| Maryland Bank 06/06/87 | 568.51 |
| Maryland Bank 09/23/87 | 497.79 |
| Mobil Oil 12/07/87 | 23.26 |
| Mobil Oil 01/12/88 | 130.85 |
| Oppenheimer–Palmieri 10/27/87 | 130.40 |

| | |
|---|---:|
| Oppenheimer–Palmieri 12/02/87 | 468.04 |
| Oppenheimer–Palmieri 12/02/87 | 88.00 |
| Oppenheimer–Palmieri 01/31/88 | 365.94 |
| Republic Bank Delaware 08/31/87 | 1,078.17 |
| Republic Bank Delaware 09/23/87 | 30.00 |
| Total | $ 31,560.80 |